SUSAN JANE BROWN (WSB #31224)
Western Environmental Law Center
4107 NE Couch Street
Portland, OR. 97232
(503) 914-1323 | Phone
brown@westernlaw.org

UNITED STATES DISTRICT COURT
DISTRICT OF WASHINGTON
TACOMA DIVISION

| | |
|---|---|
| CASCADE FOREST CONSERVANCY, GREAT OLD BROADS FOR WILDERNESS, WASHINGTON NATIVE PLANT SOCIETY, SIERRA CLUB, DR. JOHN BISHOP, DR. JAMES E. GAWEL, AND SUSAN SAUL, *Plaintiffs,* vs. UNITED STATES FOREST SERVICE, *Defendant.* | Civ. Case No. 3:21-cv-5202-RJB PLAINTIFFS' REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFEDNANT'S MOTION FOR SUMMARY JUDGMENT ORAL ARGUMENT REQUESTED NOTE ON MOTION CALENDAR: DECEMBER 3, 2021 |

WESTERN ENVIRONMENTAL LAW CENTER
4107 NE Couch Street
Portland, Oregon 97232
(503) 914-1323

1

**TABLE OF CONTENTS**

2

I.      INTRODUCTION. ................................................................................................. 1

II.     PLAINTIFFS' DECLARATIONS ARE PROPERLY BEFORE THIS COURT. ............. 1

III.    THE PROJECT VIOLATES THE NATIONAL FOREST MANAGEMENT ACT. ......... 2

        A.      FAILURE TO COMPLY WITH AQUATIC CONSERVATION STRATEGY
                (ACS) OBJECTIVES. .......................................................................... 2

                1.      ACS Objective 2. ......................................................................... 4

                2.      ACS Objective 3. ......................................................................... 5

                3.      ACS Objective 4. ......................................................................... 6

                4.      ACS Objective 5. ......................................................................... 7

                5.      ACS Objective 8. ......................................................................... 8

                6.      ACS Objective 9. ......................................................................... 9

        B.      FAILURE TO PREPARE AN ADEQUATE LAND AND RESOURCE
                MANAGEMENT PLAN AMENDMENT. ...................................... 10

IV.     THE PROJECT VIOLATES THE NATIONAL ENVIRONMENTAL POLICY ACT. 12

        A.      FAILURE TO CONSIDER THE PROJECT'S DIRECT, INDIRECT, AND
                CUMULATIVE EFFECTS. ............................................................. 12

        B.      FAILURE TO PREPARE AN ENVIRONMENTAL IMPACT STATEMENT. 15

                1.      40 C.F.R. §§ 1508.27(b)(1), (b)(2). ......................................... 15

                2.      40 C.F.R. § 1508.27(b)(3). ....................................................... 16

                3.      40 C.F.R. §§ 1508.27(b)(4), (b)(5). ......................................... 16

                4.      40 C.F.R. § 1508.27(b)(6). ....................................................... 17

                5.      40 C.F.R. § 1508.27(b)(7). ....................................................... 18

                6.      40 C.F.R. § 1508.27(b)(8). ....................................................... 18

                7.      40 C.F.R. § 1508.27(b)(10). ..................................................... 19

V.    THE COURT SHOULD VACATE AND REMAND THE PROJECT DECISION TO THE FOREST SERVICE. ................................................................................................ 19

VI.   CONCLUSION. ............................................................................................................. 20

**TABLE OF AUTHORITIES**

**Federal Cases**

*All. for the Wild Rockies v. USFS,* 907 F.3d 1105 (9th Cir. 2018) ...................................... 20

*Animal Def. Council v. Hodel*, 840 F.2d 1432 (9th Cir. 1988), *amended*, 867 F.2d 1244 (9th Cir. 1989) .......................................................................................................................... 2

*Bark v. Northrop*, 2016 WL 1181672 (D. Or. 2016) .......................................................... 3

*Bark v. U.S. Bureau of Land Mgmt.*, 643 F. Supp. 2d 1214 (D. Or. 2009)........................... 3

*Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998)..................... 7, 15

*Bowler v. Bureau of Land Management,* 2011 WL 4962150 (D. Or. Oct. 17, 2011).......................... 3

*Bowler v. U.S. Bureau of Land Mgmt.*, 488 F. App'x 252 (9th Cir. 2012)........................................... 4

*Cascadia Wildlands v. U.S. Forest Serv.*, 791 F. Supp. 2d 979 (D. Or. 2011) .................................. 13

*Citizens Against Toxic Sprays, Inc. v. Bergland*, 428 F.Supp. 908 (D. Or. 1977), *supplemented*, (D. Or. Apr. 18, 1978).................................................................................................................. 15

*City of New York v. U.S. Dep't of Transp.*, 539 F. Supp. 1237 (S.D.N.Y. 1982), *rev'd on other grounds*, 715 F.2d 732 (2d Cir. 1983)............................................................................... 16

*Cowpasture River Pres. Ass'n v. Forest Serv.*, 911 F.3d 150 (4th Cir. 2018) ................................ 12

*Envtl. Prot. Info. Ctr. v. Blackwell*, 389 F. Supp. 2d 1174 (N.D. Cal. 2004) ...................................... 1

*Friends of the Wild Rockies v. Marten*, 2020 WL 5804251 (D. Mont. 2020) ................................ 11

*Independent Towers v. Washington*, 350 F.3d 925 (9th Cir. 2003) ...................................... 17, 18, 19

*Lands Council v. McNair*, 629 F.3d 1070 (9th Cir. 2010)............................................................. 8

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372 (9th Cir. 1998)........................ 13

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520 (9th Cir. 1997)............................ 1

*Oregon Nat. Desert Ass'n v. Jewell*, 840 F.3d 562 (9th Cir. 2016) .................................................. 20

*Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028 (9th Cir. 2001) .................................................................................................................. passim

*People Against Nuclear Energy v. U. S. Nuclear Regul. Comm'n*, 678 F.2d 222 (D.C. Cir. 1982), *cleaned up*, 460 U.S. 766 (1983) ...................................................... 16

*Pollinator Stewardship Council v. U.S. E.P.A.*, 806 F.3d 520 (9th Cir. 2015)................................ 20

*Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153 (9th Cir. 1998) ........................................ 17

*Prairie Wood Products v. Glickman*, 971 F.Supp. 457 (1997) (D. Or. 1997) ................................. 11

*Sierra Club v. U.S. Forest Serv.*, 897 F.3d 582 (4th Cir. 2018)......................................................... 12

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998).............................................................. 1

*Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985) ............................................................................ 6

*W. Watersheds Project v. Bureau of Land Mgmt.*, 552 F. Supp. 2d 1113 (D. Nev. 2008) ................ 16

**Federal Statutes**

5 U.S.C. § 706(2)(A).......................................................................................................................... 20

16 U.S.C. § 1604(f)(1) ...................................................................................................................... 10

16 U.S.C. § 1604(i) ........................................................................................................................... 10

42 U.S.C. § 4321 ................................................................................................................................ 13

42 U.S.C. §§ 4363-4366.................................................................................................................... 13

42 U.S.C. § 4369 ................................................................................................................................ 13

**Federal Regulations**

36 C.F.R. § 219.8 .......................................................................................................................... 10, 12

36 C.F.R. § 219.8(b)(2) ..................................................................................................................... 11

36 C.F.R. § 219.9 .......................................................................................................................... 10, 12

36 C.F.R. § 219.10 ........................................................................................................................ 10, 12

36 C.F.R. § 219.10(a)(1) ............................................................................................................... 10, 11

36 C.F.R. § 219.11 ........................................................................................................................ 10, 12

40 C.F.R. § 1508.8 ................................................................................................... 13

40 C.F.R. § 1508.14 ................................................................................................. 13

40 C.F.R. § 1508.27(a) ............................................................................................ 13

40 C.F.R. § 1508.27(b)(1) ....................................................................................... 15

40 C.F.R. § 1508.27(b)(2) ....................................................................................... 15

40 C.F.R. § 1508.27(b)(3) ....................................................................................... 16

40 C.F.R. § 1508.27(b)(4) ....................................................................................... 16

40 C.F.R. § 1508.27(b)(5) ....................................................................................... 16

40 C.F.R. § 1508.27(b)(6) ....................................................................................... 17

40 C.F.R. § 1508.27(b)(7) ....................................................................................... 18

40 C.F.R. § 1508.27(b)(8) .................................................................................. 13, 18

40 C.F.R. § 1508.27(b)(10) ..................................................................................... 19

**Miscellaneous**

United States Forest Service, *National Forest System Land Management Planning*, Final Rule, 81
    Fed. Reg. 90,723 (Dec. 16, 2016) .......................................................................... 10

United States Forest Service, *Spirit Lake Outflow Safety Improvement Project* (visited Oct. 23, 2021),
    available at https://www.fs.usda.gov/detail/giffordpinchot/landmanagement-
    /?cid=FSEPRD488792 .......................................................................................... 15

1    **I.      INTRODUCTION.**

2          The Mount St. Helens National Volcanic Monument is a truly unique component of the

3    National Forest System for its cultural, historical, scientific, and ecological values that it provides to

4    present and future generations. The Forest Service has elected to despoil this irreplaceable gem by

5    building an ill-conceived road across the heart of the Monument without complying with

6    environmental laws enacted to protect special places like Mount St. Helens. This Court should grant

7    Plaintiffs' motion for summary judgment[1] and require the Forest Service to rethink its plans.

8    **II.     PLAINTIFFS' DECLARATIONS ARE PROPERLY BEFORE THIS COURT.**

9          This Court should deny the Forest Service's motion to strike all of Plaintiffs' declarations

10   because Plaintiffs are entitled to submit standing declarations that testify to their ability to bring suit

11   and show irreparable harm to their interests warranting a permanent injunction. *Nw. Envtl. Def. Ctr.*

12   *v. Bonneville Power Admin.*, 117 F.3d 1520, 1527–28 (9th Cir. 1997). The Forest Service also does

13   not identify in its motion which declarations, or portions of them, it seeks to strike: instead, it alleges

14   without specificity that *all* of Plaintiffs' declarations contain extra-record information not properly

15   before this court. The government is incorrect, and the motion should be denied.

16         Plaintiffs are entitled to submit standing declarations for the purposes of demonstrating the

17   constitutional minimum to bring suit in federal court, and to demonstrate how the federal action at

18   issue causes Plaintiffs irreparable harm. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95

19   (1998). Even if a declaration contains extra-record material, which Plaintiffs' declarations do not, a

20   court may still consider it for the limited purpose of establishing standing. *Envtl. Prot. Info. Ctr. v.*

21   *Blackwell*, 389 F. Supp. 2d 1174, 1220–21 (N.D. Cal. 2004). This kind of extra-record information

22   may be admitted as an exception to the usual rule that judicial review is limited to the administrative

23

24   ───────────────
     [1] On reply, Plaintiffs elect to abandon their Second Claim for Relief.

record. *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1436–37 (9th Cir. 1988), *amended*, 867 F.2d 1244 (9th Cir. 1989).

Plaintiffs include conservation organizations, private citizens who have a long history with the designation and management of the Monument, and scientists who are the leading experts in their field who conduct research on the Monument: that each of these individuals will be uniquely and irreparably harmed by the Project does not somehow convert their standing statements and proffered evidence of irreparable harm to extra-record evidence, even if that harm is to scientific research and education. Bishop Decl. ¶¶ 3-35, Gawel Decl. ¶¶ 3-30, LeRoy Decl. ¶¶ 2-22, Dale Decl. ¶¶ 1-23 (testifying to irreparable harm to declarants' professional scientific research, pedagogy, and livelihood); *see also*, First Declarations of Lucy Brookham, Christine Colasurdo, Laurie Kerr, Susan Saul, Charles Raines, Emily Waters, and Rebecca Evans (testifying to declarants' additional categories of irreparable harm). Plaintiffs' declarations are properly before this Court in their entirety, and the Court should deny reject the Forest Service's underhanded efforts to silence these individuals.

## III.    THE PROJECT VIOLATES THE NATIONAL FOREST MANAGEMENT ACT.

### A.    FAILURE TO COMPLY WITH AQUATIC CONSERVATION STRATEGY (ACS) OBJECTIVES.

"The purpose of ACS is to maintain and restore ecosystem health at watershed and landscape scales to protect habitat for fish and other riparian-dependent species and resources and restore currently degraded habitats. This general mission statement in NFP does not prevent project site degradation and does nothing to restore habitat over broad landscapes if it ignores the cumulative effect of individual projects on small tributaries within watersheds." *Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1035–36 (9th Cir. 2001) (*PCFFA*). The Forest Service did not address this precedent in its response brief, instead arguing to the contrary that the ACS permits "limited, short-term negative effects on aquatic habitat or riparian areas so long as

1   those areas will be maintained or improved 'in the long term.'" ECF 40 at 15. The agency also argues

2   that Plaintiffs' citation to a hydrology report for the partially implemented 2018 version of the Project

3   undermines Plaintiffs' claim that the Project violates the ACS. Neither argument is well-taken.

4   First, in *PCFFA* the Ninth Circuit held that the ACS applies at all spatial and temporal scales,

5   and expressly rejected the federal government's argument there (and offered here) that "the proper

6   level to evaluate ACS consistency is the watershed" versus project level because "the effects of

7   numerous [project] actions can cause significant damage to fish species and their habitat," an impact

8   the Northwest Forest Plan (NFP) prohibits. 265 F.3d at 1037. The Court also rejected the argument

9   that "only degradations that persist more than a decade and are measurable at the watershed scale will

10   be considered to degrade aquatic habitat," because "[t]his generous time frame ignores the life cycle

11   and migration cycle of anadromous fish" and aquatic processes that the ACS protects. *Id.*

12   The cases to the contrary cited by the Forest Service are inapposite. *Bark v. U.S. Bureau of*

13   *Land Mgmt.*, 643 F. Supp. 2d 1214, 1234-35 (D. Or. 2009) examined whether logging in Riparian

14   Reserves was *necessary* to meet the ACS Objectives and did not address whether the Project

15   complied with the ACS despite adverse effects, as is the issue in this case. In *Bark v. Northrop*, 2016

16   WL 1181672 (D. Or. 2016), the Forest Service utilized project design criteria to address not only

17   sediment produced by the project but also legacy sediment effects from past actions, thus finding

18   consistency with the ACS's "maintain and restore" mandate. *Id.* at *17. But in the present case, the

19   agency's analysis identified a litany of detrimental water quality impacts in the short and long term

20   such that "consistency with the Aquatic Conservation Strategy would be challenging." AR 04336;

21   03279-80, 03287, 03295-3303. And, as evidenced by the Ninth Circuit's affirmance in *Bowler v.*

22   *Bureau of Land Management,* 2011 WL 4962150, at *5–6 (D. Or. Oct. 17, 2011), it is not clear from

23   the District Court's opinion what aspect of the ACS the plaintiffs in that case argued that project

24

1    violated, undermining the government's reliance on that case here. *Bowler v. U.S. Bureau of Land*

2    *Mgmt.*, 488 F. App'x 252, 253 (9th Cir. 2012).

3         Second, the Forest Service criticizes Plaintiffs for frequently citing the hydrology report for

4    the 2018 Spirit Lake Motorized Access for Core Sampling and Inlet Access Project – a project that

5    the Forest Service partially implemented in 2018 – arguing that the 2018 report supported "a

6    different" or "unrelated project." *See*, ECF 40 at 18, 19, 21, 37. But the Forest Service ignores the

7    fact that the current Project uses the same route to the drilling area analyzed in the 2018 hydrology

8    report, rendering the 2018 report's conclusions regarding that route equally applicable to the effects

9    of the 2021 Project challenged in this case. AR 04043, 05547.

10         **1.      ACS Objective 2.**

11         ACS Objective 2 requires the Forest Service to "Maintain and restore spatial and temporal

12    connectivity within and between watersheds." AR 01457. The Project will not meet this Objective

13    because the proposed road will cross numerous waterways, thus physically disrupting existing stream

14    courses and inter- and intra-watershed connectivity, AR 06075, 05406-08, 06077, 06079-80, 06081-

15    84, 02856, 03992, 06685-86, and critical nearshore shallow habitat located along the south shore of

16    Spirit Lake will be compromised by construction and use of the barge loading area, alterations that

17    the ACS prohibits, AR 04417, 04420, 04337, 06085, 04749-50, 04751. In response, the Forest

18    Service argues that the purpose of ACS Objective 2 will be met at "the watershed and landscape

19    scale," that only "localized effects" will occur, and that any effects will be "temporary" in nature.

20    ECF 40 at 16-17. But the Ninth Circuit has squarely rejected this rationalization, as well as the

21    argument that the ACS allows de minimis exceptions to it. *PCFFA* at 1035–38.

22         The Forest Service also states that waterway crossings are permitted because "culverts or

23    bridges would be used at stream crossings" and other mitigation measures will be employed to

24

1   protect water quality. ECF 40 at 16. However, The NFP states "do not use mitigation or planned

2   restoration as a substitute for preventing habitat degradation," AR 01507, so the Forest Service

3   cannot rely on project design criteria to compensate for the Project's environmental harms.

4        The Forest Service next observes that the proposed construction is within the footprint of the

5   pumping station used by the Corps of Engineers after the 1980 eruption, suggesting that the

6   construction of new infrastructure in a similar location is permissible. ECF 40 at 17. The agency cites

7   no legal authority for this proposition: what actions the *Corps* took in 1980 in response to an

8   emergency created by an unprecedented natural disturbance event has no bearing on what actions the

9   *Forest Service* proposes to take today and whether those actions comply with forest plan

10   requirements that did not exist in 1980. Instead, contemporary law prohibits this new use of the banks

11   of Spirit Lake because the new infrastructure will physically disrupt watershed connectivity. AR

12   01457, 04417, 04420, 04337, 06085, 04749-50.

13        **2.**       **ACS Objective 3.**

14        ACS Objective 3 requires the Forest Service to "Maintain and restore the physical integrity of

15   the aquatic system, including shorelines, banks, and bottom configurations." AR 01457. The Project

16   will not meet this Objective because it requires dredging of Spirit Lake and redeposition of dredged

17   materials into the lake and on the lake shore, which will adversely affect aquatic life, interrupt the

18   chemistry at the sediment-water interface, impact nutrient transport, and bury benthic organisms. AR

19   06089, 04417, 04750, 04751, 05553. The Forest Service portrays this surface and subsurface

20   disturbance as minor and temporary, ECF 40 at 14, but again, the ACS does not permit de minimis

21   violations of its requirements, *PCFFA* at 1036–38, and the record reveals that these effects will

22   persist for decades, AR 05575, 05569, in violation of the ACS.

23

24

1

        **3.**       **ACS Objective 4.**

2       ACS Objective 4 requires the Forest Service to "Maintain and restore water quality necessary

3 to support healthy riparian, aquatic, and wetland ecosystems." AR 01457. The Project will not meet

4 this Objective because water quality will be degraded by the disposal of drilling mud into a very

5 permeable aquifer and because the "operation of heavy equipment and off road vehicles in and

6 adjacent to streams may cause chemical contamination of waterbodies from leakage of fluids or

7 failure of equipment." AR 05557, 03279, 03294, 04752, 03279, 03298-99. The Forest Service retorts

8 that the drilling mud is non-toxic, and that Plaintiffs have not shown that there are adverse

9 environmental consequences from its use. ECF 40 at 18. But the toxicity of drilling mud is not at

10 issue: ACS Objective 4 states that "chemical integrity" of the water resource must be maintained and

11 restored, and the chemical integrity of water quality on the Pumice Plain may change due to

12 accidental and intentional disposal of drilling mud. AR 03279. And two, it is the Forest Service's

13 obligation to assess the effects of its actions, not Plaintiffs'. *Thomas v. Peterson*, 753 F.2d 754, 765

14 (9th Cir. 1985) ("it is not the responsibility of the Plaintiff to prove, nor the function of the courts to

15 judge, the effect of a proposed action...when proper procedures have not been followed").

16       Similarly, the Forest Service states that because "the Project provides for robust measures to

17 prevent detrimental effects to water quality" from chemical contamination by equipment use on the

18 Pumice Plain, that there can be no violation of ACS Objective 4. ECF 40 at 19. However, the record

19 reveals that given the very rugged terrain on the Pumice Plain, the number of required equipment

20 passes, and the duration of the project, petroleum and other chemical contamination is likely. AR

21 03298-99; *see also* 01507. Indeed, the agency concluded that "best management practices...will

22 reduce but not eliminate the risk of contamination," thus belying its litigation position that the Project

23 will maintain and restore water quality. AR 03298.

24

1

    **4.**  **ACS Objective 5.**

2

   ACS Objective 5 requires the Forest Service to "Maintain and restore the sediment regime

3

under which aquatic ecosystems evolved. Elements of the sediment regime include the timing,

4

volume, rate, and character of sediment input, storage, and transport." AR 01457. The Project will not

5

meet this Objective because road construction and use will increase sediment delivery to streams and

6

Spirit Lake and alter the timing, storage, and transport of sediment. AR 04337, 06077-84, 02857,

7

02858-62, 03276-77, 03278, 03279, 03294, 03295-98. Although the record reveals that sedimentation

8

would increase in the short- and long-term, *id*, the agency argues that there would be no ACS

9

violation because the Project's contribution to sedimentation levels would be "minor or negligible

10

compared to background sediment production of the surrounding area" due to the 1980 volcanic

11

eruption. ECF 40 at 18, 19. The Ninth Circuit has rejected this kind of false comparison, explaining

12

that "whether the increased erosion from logging and roadbuilding is smaller or larger than that

13

produced by the fire is irrelevant. The proper evaluation should identify the impact of the increased

14

sediment from the logging and roadbuilding on the fisheries habitat in light of the documented

15

increases that already have resulted from the fire." *Blue Mountains Biodiversity Project v.*

16

*Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998). The same is true here: the Forest Service cannot

17

hide a violation of ACS Objective 5 behind the highly dynamic and erosive nature of the Pumice

18

Plain, particularly because the anthropogenic input of sediment will occur at different times of year

19

than natural processes and will persist for many years. AR 03296. Because the agency's experts

20

found that the Project would significantly increase sediment to waterways, its conclusion that the

21

Project "mostly and primarily" [2] complied with ACS Objective 5 is arbitrary and capricious because

22

23

---

24

[2] "Mostly and primarily maintained" is not "maintained," which is what the ACS requires: instead, it is partial maintenance, and it certainly is not restoration.

1   the "choice made" does not follow from the "facts found." *Lands Council v. McNair*, 629 F.3d 1070,

2   1074 (9th Cir. 2010).

3           **5.**      **ACS Objective 8.**

4         ACS Objective 8 requires the Forest Service to "Maintain and restore the species composition

5   and structural diversity of plant communities in riparian areas and wetlands to provide adequate

6   summer and winter thermal regulation, nutrient filtering, appropriate rates of surface erosion, bank

7   erosion, and channel migration and to supply amounts and distributions of coarse woody debris

8   sufficient to sustain physical complexity and stability." AR 01457. The Project will not meet this

9   Objective because road construction and use will remove native vegetation at the intersections of the

10  road and aquatic features that will alter stream channel dynamics, shift channels, lead to channel

11  drying, disconnect spring sources, alter the hydrology of sensitive wetlands, and alter the banks of

12  Spirit Lake. AR 06077, 06079-80, 06081-84, 02858-62, 03279, 03293, 03299-03300, 04751. The

13  Forest Service offers three arguments in response, none of which are persuasive.

14        First, it states that the removal of vegetation at the intersections of the road and aquatic

15  features is limited in scope, an impact that it suggests is de minimis and therefore not a violation of

16  the ACS. ECF No. 40 at 20. However, the ACS does not recognize "de minimis" violations, and the

17  agency's own analysis concludes that the Project will cause measurable adverse changes to aquatic

18  functions and processes. AR 03279, 03293-94, 03299-03300, 04751.[3] Second, the Forest Service

19  argues that *Plaintiffs* have failed to show how removing vegetation along aquatic features violates the

20  ACS. ECF 40 at 20. But not only is it not Plaintiffs' duty to conduct an adequate analysis, but also

21

22

23  [3] The Forest Service regularly uses speculative language such as the Project "may cause" certain adverse effects or that
    they "may occur." This terminology indicates a lack of certainty that supports Plaintiffs' argument that the effects of the
    Project are highly unknown and uncertain thus compelling the preparation of an EIS, *see infra* Section IV.B, and does not
24  comport with the "maintain and restore" mandate of the ACS: whatever "may cause" or "may occur" means, it is
    certainly not equivalent to the "maintain and restore" finding the ACS requires.

1    the Forest Service itself concluded that vegetation removal will adversely affect aquatic processes

2    protected by the ACS. AR 03279, 03293-94, 03299-03300, 04751. Finally, the Forest Service argues

3    that any vegetation removed by the Project will be replanted, suggesting that this will mitigate

4    adverse effects. ECF 40 at 20. The Forest Service offers no evidence that replanting will mitigate the

5    predicted effects, and regardless, the NFP prohibits the use of mitigation or restoration "as a

6    substitute for preventing habitat degradation." AR 01507.

7            **6.      ACS Objective 9.**

8            ACS Objective 9 requires the Forest Service to "Maintain and restore habitat to support well-

9    distributed populations of native plant, invertebrate, and vertebrate riparian-dependent species." AR

10   01458. The Project will not meet this Objective because it will introduce and increase the spread of

11   New Zealand mud snails (NZMS) that threaten native aquatic biodiversity, AR 03988, 03989, 04750,

12   04724, 05599, alter stream geomorphology and processes through increased sedimentation that will

13   reduce suitable habitat for native juvenile and adult fish and other riparian-dependent native aquatic

14   wildlife, AR 03989-90, and destroy native plant species surrounding riparian areas by construction

15   and operation of the proposed road, AR 06077, 06079-80, 06081-84, 02858-62, 03279, 03299-03300,

16   04342, 04751. In response, the Forest Service argues (against its own expert conclusions in the

17   record) that NZMS are not "habitat" and therefore their introduction and spread cannot amount to a

18   violation of ACS Objective 9. ECF 40 at 21. Experts explain that NZMS feast on other aquatic

19   invasive species such as the Eurasian watermilfoil, which spreads easily by physical fragmentation

20   that will occur in Spirit Lake from gate replacement and construction and use of the barge facility. As

21   the host species is further spread by human disturbance, habitat – food sources – for NZMS will also

22   expand into areas not already colonized by NZMS.[4] AR 03988, 04723-24.

23   _____

24   [4] The Forest Service offers that project design criteria will limit the introduction and spread of NZMS, but the NFP
     prohibits reliance on these measures "as a substitute for preventing habitat degradation" in the first instance. AR 01507.

1    The Forest Service does not respond to Plaintiffs' arguments that road construction and use

2    will increase sedimentation and destroy globally unique native plant associations, ECF 18 at 21,

3    instead referring the Court to its rebuttal argument pertaining to ACS Objectives 5, ECF 40 at 21. The

4    agency has failed to explain how an acknowledged increase in sedimentation and loss of native plant

5    species is consistent with ACS Objective 9.

6    **B.    FAILURE TO PREPARE AN ADEQUATE LAND AND RESOURCE
       MANAGEMENT PLAN AMENDMENT.**

7    The Forest Service asserts that it is permitted to "partially suspend" the application of

8    protective visual requirements of the Land and Resource Management Plan (LRMP or forest plan),

9    ECF 40 at 25, but this assertion is incorrect for several reasons. First, the National Forest

10   Management Act (NFMA) requires the Forest Service to develop "one integrated plan for each unit

11   of the National Forest System" (i.e., the forest plan), and to ensure that projects conform to that "one

12   integrated plan:" the statute provides no authority to "partially suspend" the application of an LRMP

13   to a project. 16 U.S.C. §§ 1604(f)(1), 1604(i). There can be no "one integrated plan" if an important

14   protective requirement in the LRMP is "partially" inapplicable to a project.

15   Second, like the statute, the NFMA planning regulations do not permit the partial suspension

16   of LRMP requirements. Forest Service, *National Forest System Land Management Planning*, Final

17   Rule, 81 Fed. Reg. 90,723, 90,725-726 (Dec. 16, 2016) (rejecting the position that projects may be

18   exempted from plan requirements through project-level amendments); 36 C.F.R. §§ 219.8-219.11.

19   The agency's litigation position would render the 2012 Planning Rule, the 2016 amendment, and

20   even land and resource management plans illusory because the Forest Service could merely exempt

21   any Project from plan standards on a whim. This is not what Congress intended in enacting NFMA.

22   Third, the Forest Service erroneously relies on a prior planning rule to argue that it may

23   exempt the Project from LRMP visual requirements. ECF 40 at 24. The Forest Service states that the

24

1  amendment would still meet the substantive requirements of the 2012 Planning Rule because: (1) the

2  amendment only affects a small area; (2) the amendment is for a limited duration; and (3) the Forest

3  Plan still applies forestwide. ECF 40 at 26. These three factors were previously used for project-level

4  forest plan amendments under the 1982 planning rule that is no longer in effect. *See Prairie Wood*

5  *Products v. Glickman*, 971 F.Supp. 457, 463-64 (1997) (D. Or. 1997) (discussing the process for

6  amending forest plans under the 1982 regulations). The agency similarly states that "the project

7  specific amendment will meet the *overarching goals* of the substantive requirements related to 36

8  C.F.R. [§§] 219.8(b)(2) and 219.10(a)(1)." ECF 40 at 25 (emphasis added). But the amendment –

9  which exempts the Project from plan requirements – *does not* meet the overarching goals of the

10  substantive provisions of the 2012 planning rule because it is devoid of content: as a nullity, it

11  necessarily cannot meet the substantive regulatory provisions.

12      To justify its unlawful exemption of the Project from LRMP visual requirements, the Forest

13  Service points to an unpublished out-of-District case with no precedential value, *Friends of the Wild*

14  *Rockies v. Marten*, No. 20-cv-19-M-DLC, 2020 WL 5804251 (D. Mont. Sept. 29, 2020), but that case

15  is factually dissimilar than the present case. In *Marten*, the Forest Service proposed a site-specific

16  forest plan amendment that suspended three elk habitat standards within a project area that was

17  already out of compliance with those standards. *Id.* at *22. The project also included plans to

18  decommission roads that would decrease overall road density in the project area to benefit elk. *Id.* at

19  *24-25. As a result, the court found that the project met the purpose of the amended plan content,

20  which was to provide sufficient habitat for elk and hunting opportunities for the public. *Id.* But unlike

21  *Marten*, here the Project area is not out of compliance with the visual quality objective; visitors'

22  visual experience will be substantially negatively affected for up to 25 years, longer than the lifespan

23  of the forest plan the Project purports to amend, AR 05575, 05569; 16 U.S.C. § 1604(f)(5) (plans

24

must be revised every 15 years); and the Project will make no improvements to visual resources in the most visited and viewed part of the Monument, AR 06313.

Finally, the Forest Service argues that two Fourth Circuit cases, *Sierra Club v. U.S. Forest Serv.*, 897 F.3d 582 (4th Cir. 2018) and *Cowpasture River Pres. Ass'n v. Forest Serv.*, 911 F.3d 150 (4th Cir. 2018), are not on point and due no deference. ECF 40 at 26. The agency is incorrect: the Fourth Circuit, the highest court to consider the issue, twice held that the Forest Service was required to both "determine which specific substantive requirement(s) within §§ 219.8 through 219.11 are directly related to the plan direction being added, modified, or removed by the amendment, *and then apply such requirement(s)* within the scope and scale of the amendment." *Sierra Club* at 600-601, 603; *Cowpasture* at 163. These are the same facts as in the present case: the Forest Service has also failed to correctly apply the substantive requirements of the 2012 Planning Rule, instead merely concluding that the amendment "would not be substantial" despite exempting the Project from meeting the visual quality objective of the Forest Plan for up to 25 years. AR 06313.

## IV.     THE PROJECT VIOLATES THE NATIONAL ENVIRONMENTAL POLICY ACT.

### A.     FAILURE TO CONSIDER THE PROJECT'S DIRECT, INDIRECT, AND CUMULATIVE EFFECTS.

The Forest Service failed to consider three types of direct, indirect, and cumulative effects from: 1) the geotechnical and core sampling on the Pumice Plain; 2) the ongoing scientific research that will be disrupted or precluded by implementation of the Project; and 3) the effects of past, present, and reasonably foreseeable future actions. ECF 18 at 27-30. The agency argues that it considered the direct, indirect, and cumulative effects of geotechnical and core sampling on the Pumice Plain and cites to record citations where this analysis can allegedly be found, ECF 40 at 28, but simply stating that an action (e.g., core sampling) will occur is not equivalent to analyzing the *environmental consequences* of the action: in each instance, the preferred citation lacks any

description of the qualitative nature of the effect. *See* AR 06114, 05575, 05590, 05603, 05608. NEPA requires *analysis* of the environmental consequences of an action, not just the disclosure of agency action. *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998).

Next, the government states that it did not need to assess the effects of the Project on ongoing scientific research because scientific investigation is not a biophysical resource to which NEPA applies. ECF 40 at 29. The agency is mistaken. Part of the declaration of congressional purpose of NEPA is to "to enrich the understanding of the ecological systems and natural resources important to the Nation," 42 U.S.C. § 4321, an understanding that is served by the world-renowned research that will be disrupted or precluded by the Project. *See also* 42 U.S.C. §§ 4363-4366, 4369. In turn, the NEPA regulations require the Forest Service to consider the "effects" of the Project on the "human environment" including social, economic, and educational effects, all of which are implicated by the disruption of scientific research in the Project area. 40 C.F.R. §§ 1508.8, 1508.14. The Forest Service must also assess the potential significance of an action "in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality," *id*. at § 1508.27(a): here, the context of the research underway at Mount St. Helens has international, national, regional, and local value and implications given the designation of the Project area as a Class I Research Area. And, the regulations require the preparation of an environmental impact statement (EIS) to assess "the degree to which the action may…cause loss or destruction of significant *scientific*, cultural, or historical resources," 40 C.F.R. § 1508.27(b)(8) (emphasis added), exactly what the agency failed to do here. Interpreting these regulations, the Court in *Cascadia Wildlands v. U.S. Forest Serv.*, 791 F. Supp. 2d 979, 984–87, 991–93 (D. Or. 2011), held that NEPA compelled supplementation of stale environmental analysis when the underlying purpose and need of a *research* project changed, demonstrating that NEPA applies equally to an assessment of the Project's impact on scientific study.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Finally, the Forest Service argues that it considered the direct, indirect, and cumulative effects of the Project in conjunction with the effects of past, present, and reasonably foreseeable future actions, ECF 40 at 29-30, but this rebuttal fails to persuade for several reasons. One, the government does not dispute that the route to Duck Bay on Spirit Lake constructed in 2018 will be used in the future to maintain the gate at Spirit Lake, i.e., the gate that the current Project proposes to remove and replace. The EA, to which the Forest Service solely cites in support of its claim that it considered the direct, indirect, and cumulative effects of the Project, states in each proffered instance that the direct and indirect effects of the use of the Duck Bay route are "low," and "Because these impacts are consider [*sic*] low the cumulative effects are anticipated to be the same as direct and indirect effects." ECF 40 at 32 (citing EA). That this conclusion – including its grammatical error – is boilerplate does not demonstrate that the agency in fact assessed the direct, indirect, and cumulative effects of the use of the Duck Bay route to maintain the Spirit Lake gate: in fact, there is nothing in the record that discloses what these effects are, as "low" is not an objective description of effect.

Two, the Forest Service claims that long-term management of Spirit Lake is neither a connected action[5] nor reasonably foreseeable so there was no obligation for the agency to assess the consequences of that action. ECF 40 at 32-33. Not only is this litigation position contradicted by the Forest Service's brief that acknowledges the need for a long-term management solution, ECF 40 at 6, 7, but also it is belied by extensive record evidence that the Forest Service has been concerned about the long-term management of Spirit Lake since the 1980 eruption and has taken intermediate steps towards developing that course of action without a big-picture review and analysis of potential

---

[5] The Forest Service states that "there is no other project to which the Project could be connected" and "the Project would still have independent utility by providing for the collection of data and replacement of the tunnel inlet structure." ECF 40 at 33. But the Forest Service is not collecting data through geotechnical drilling for data collection's sake: it is collecting that data to inform future management options, and it is those future management options to which the Project is directly connected. AR 06066, 05481, 05744-49, 06066, 03929, 04497. That the replacement of the gate has independent utility does not demonstrate that *the Project as a whole* – which includes geotechnical drilling – is not connected to other actions.

PAGE 14 – PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

management options. AR 00099-00435, 02977- 03140, 03317-653, 06066, 05481, 05744-49, 06066, 03929, 04497; *see also* Saul Decl. ¶¶ 37, 41-43, 60-62; Raines Decl. ¶¶ 5, 33-35. In fact, the Forest Service has initiated the Spirit Lake Outflow Safety Improvement Project "to create more sustainable and safer options for long term management of Spirit Lake Outflow to achieve ecological, economic and public safety needs." United States Forest Service, *Spirit Lake Outflow Safety Improvement Project* (visited Oct. 23, 2021), available at https://www.fs.usda.gov/detail/giffordpinchot/-landmanagement/?cid=FSEPRD488792.[6] This is evidence of a reasonably foreseeable future connected action with direct, indirect, and cumulative effects that the agency did not consider.

## B.   FAILURE TO PREPARE AN ENVIRONMENTAL IMPACT STATEMENT.

### 1.   40 C.F.R. §§ 1508.27(b)(1), (b)(2).

In addition to the adverse effects expected from the Project that may be significant, the important beneficial public safety effects of the Project touted by the Forest Service compel the preparation of an EIS. ECF 18 at 32-33; *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1216 (9th Cir. 1998) (requiring an EIS when a project *may* have significant effects). The Forest Service disclaims the possibility of significant adverse effects from the Project despite record evidence to the contrary, and states without legal authority that an EIS is not required for a project with beneficial effects. ECF 40 at 35. In fact, the NEPA regulations and case law belie the agency's litigation position. 40 C.F.R. §§ 1508.27(b)(1), (b)(2); *Citizens Against Toxic Sprays, Inc. v. Bergland*, 428 F.Supp. 908, 927 (D. Or. 1977), *supplemented*, (D. Or. Apr. 18, 1978);[7] *People*

---

[6] A court may take judicial notice of matters of public record, including agency records. *See Mack v. S. Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986); *Ursack, Inc. v. Sierra Interagency Black Bear Group*, 2009 WL 2422784, *6 (N.D. Cal. 2009) (judicial notice of agency materials posted on agency website); *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 702 n.22 (10th Cir. 2009) (taking judicial notice of information on government websites in Administrative Procedure Act case).

[7] The agency takes issue with the citation of this case because it did not involve 40 C.F.R. §§ 1508.27(b)(1) or (b)(2). ECF 40 at 35. However, the case did hold that the EIS there was fatally deficient for failing to consider the effects of agency action on public health and given that public health – the lives of downstream residents – is at issue in the present case, *Bergland* at the very least is persuasive authority regarding the requirement to prepare an EIS.

1   *Against Nuclear Energy v. U. S. Nuclear Regul. Comm'n*, 678 F.2d 222, 228 (D.C. Cir. 1982),

2   *cleaned up*, 460 U.S. 766 (1983); *City of New York v. U.S. Dep't of Transp.*, 539 F. Supp. 1237,

3   1274–75 (S.D.N.Y. 1982), *rev'd on other grounds*, 715 F.2d 732 (2d Cir. 1983).

4   　　　　　　　　　　**2.   40 C.F.R. § 1508.27(b)(3).**

5   　　　　The Forest Service does not dispute that the Project area is globally unique in character,

6   instead arguing that any effects to these resources will be minimal or limited in scope and duration.

7   ECF 40 at 36 (wetlands will be avoided where possible, the acreage of affected research plots is

8   small, and any adverse effects will last for a short duration). But the record reveals that wetlands will

9   *not* be avoided, AR 04749-50, 04342-43, 04751, 04749, 06085, 03294, and while a relatively small

10  acreage of research plots will be affected compared to the size of the entire Monument, dozens of

11  researchers and scientific experts explained during Project development that the impact on scientific

12  inquiry and pedagogy will be catastrophically significant and permanent in duration. AR 05811,

13  05815, 05819, 05820, 05822, 05834, 05836-37, 05841, 05847, 05853, 05860, 05879, 05962, 05970-

14  71, 04238-40, 06786, 04163-70, 05825, 04467-68, 03114; Gawel Decl. ¶¶ 3-30; Bishop Decl. ¶¶ 21-

15  29; Leroy Decl. ¶¶ 5-7, 12; Evans Decl. ¶ 2-23.

16  　　　　　　　　　　**3.   40 C.F.R. §§ 1508.27(b)(4), (b)(5).**

17  　　　　An EIS is required when the effects of an action are highly controversial, highly uncertain, or

18  involve unique or unknown risks, and when the gathering of additional data would address the

19  uncertainty and risk. *W. Watersheds Project v. Bureau of Land Mgmt.*, 552 F. Supp. 2d 1113, 1135–

20  36 (D. Nev. 2008). While Plaintiffs are unsatisfied with the decision to prepare an EA rather than an

21  EIS for the Project, they are *not* opposed to addressing downstream community safety needs as the

22  Forest Service suggests. ECF 40 at 37; *contra* Kerr Decl. ¶ 9; Waters Decl. ¶¶ 8-13; Raines Decl. ¶¶

23  26, 35; Dale Decl. ¶¶ 19-21; LeRoy Decl. ¶ 22.

24

Instead, the record reveals that the Project is highly controversial – i.e., there is a substantial dispute about the size, nature, or effect of the Project – and that there is a great deal about the Pumice Plain and Spirit Lake that is unknown, information without which the Forest Service cannot make an informed decision and that could be developed through the preparation of an EIS. AR 03292, 03287, 03294, 03300, 03987, 04752, 03302, 04233-36. For example, it is unknown what the short- and long-term effects on ongoing scientific research will be from the Project, which may represent a fundamental loss of irreplaceable scientific information about geologic and biological processes. AR 03988, 03989-90, 04467-68. It is also unknown how the further introduction and spread of New Zealand mud snails, a highly invasive species, will affect the newly developing ecology of Pumice Plain streams and Spirit Lake. AR 03988, 04750, 04724, 03989-90; Gawel Decl. ¶¶ 21-26. The Pumice Plain and Spirit Lake are ecological features that exist nowhere else on earth, and the Forest Service has never before built, used, and remediated a vehicular road in an analogous ecological setting because none exists. AR 03300, 03292, 03312, 04467-68, 03110-13. The agency did not respond to these arguments in its responsive brief, therefore waiving its ability to do so on reply. *Independent Towers v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (courts cannot manufacture arguments for litigants because "judges are not like pigs, hunting for truffles buried in briefs").

### 4.  40 C.F.R. § 1508.27(b)(6).

Although the parties agree that courts have been reluctant to find that EAs are precedential in nature, the purpose of this regulation "is to avoid the thoughtless setting in motion of a chain of bureaucratic commitment that will become progressively harder to undo the longer it continues." *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1162–63 (9th Cir. 1998). The Project represents exactly the rare bureaucratic steamroller the regulation is intended to guard against: the record is plain that the Project is the first step in addressing the long-term management of Spirit Lake because once the Forest Service builds the road and literally and metaphorically goes down it to

1  gather geotechnical data, it is possible – perhaps likely – that the road will be used in the future for

2  the long-term management that the Project is intended to obtain data to inform. AR 00099-00435,

3  02977- 03140, 03317-653, 06066, 05481, 05744-49, 06066, 03929, 04497; *see also* Saul Decl. ¶¶ 37,

4  41-43, 60-62; Raines Decl. ¶¶ 5, 33-35.

5       The Forest Service responds that "a road was already built across the Pumice Plain along the

6  precise route that the temporary road will be reconstructed," presumably intimating that the effects

7  are therefore not significant and can be rehabilitated. ECF 40 at 38. That the *Army Corps of*

8  *Engineers* (not the Forest Service) constructed a motorized road *under emergency circumstances in*

9  *the wake of the 1980 eruption* in no way demonstrates that the Project is not a precedential action.

10  The current recreational trail is managed exclusively for nonmotorized use, whereas the Project will

11  construct and operate a motorized road for decades: this change in type of use is precedential. And,

12  while the agency today claims that the road will be rehabilitated after its use (having never before

13  conducted such rehabilitation in this dynamic landscape), the route likely will be used again in the

14  future as part of the long-term management solution for Spirit Lake.

15               **5.   40 C.F.R. § 1508.27(b)(7).**

16       In response to Plaintiffs' claim that the Project may have cumulatively significant

17  environmental impacts, the Forest Service refers the Court to its arguments responding to Plaintiff's

18  Fourth Claim for Relief. ECF 40 at 39 n. 13. This is insufficient to prevail on Plaintiffs' Fifth Claim

19  for Relief, and the government has waived its ability to respond to this claim in its reply brief.

20  *Independent Towers*, 350 F.3d at 929.

21               **6.   40 C.F.R. § 1508.27(b)(8).**

22       Mount St. Helens National Volcanic Monument, the Pumice Plain, and Spirit Lake represent a

23  truly globally unique natural environment and world-class research laboratory. AR 05811, 05815,

24  05819, 05820, 05822, 05834, 05836-37, 05841, 05847, 05853, 05860, 05879, 05962, 05970-71,

1   04238-40, 06786, 06747-49, 04163-70, 05825; Bishop Decl. ¶¶ 3-35; Gawel Decl. ¶¶ 3-30; LeRoy

2   Decl. ¶¶ 2-22; Dale Decl. ¶¶ 1-23. Other than reiterating its flawed argument that NEPA does not

3   apply to scientific research, the Forest Service does not address this issue in its responsive brief.

4   Likewise, the Forest Service did not address Plaintiffs' argument that the Project area is a historical

5   resource. ECF 18 at 39-40. The government has waived its opportunity to address these points on

6   reply. *Independent Towers*, 350 F.3d at 929.

7       The only aspect of this argument that the Forest Service addresses pertains to Lawetlat'la,

8   wherein the agency states that it disclosed the existence of Lawetlat'la but found there would be no

9   significant effects to this Traditional Cultural Property because "any visual, atmospheric, or audible

10   effects are limited to the Project's duration;" it does not address either the Pumice Plain or Spirit

11   Lake's nature as cultural resources. ECF 40 at 39 (citing AR 06255). Regardless, the record is plain

12   that visual and audible effects will continue for up to 25 years, AR 05575, 05569, a period that at the

13   very least *may* be significant to not only Lawetlat'la but also the Pumice Plain and Spirit Lake.

14                    **7.  40 C.F.R. § 1508.27(b)(10).**

15       The Project threatens several significant violations of the Northwest Forest Plan and therefore

16   the National Forest Management Act, federal laws enacted for the protection of the environment. The

17   Forest Service failed to substantively respond to this argument in its responsive brief, instead

18   referring the Court to its arguments responding to Plaintiff's Fourth Claim for Relief. ECF 40 at 39 n.

19   13. This is insufficient to prevail on Plaintiffs' Fifth Claim for Relief, and the government has waived

20   its ability to respond to this claim in its reply brief. *Independent Towers*, 350 F.3d at 929.

21   **V.    THE COURT SHOULD VACATE AND REMAND THE PROJECT DECISION TO
         THE FOREST SERVICE.**

22       The Forest Service asks the Court to allow additional briefing regarding the remedy in this

23   case due to the "highly disruptive consequences of not being able to timely replace the tunnel inlet

24

structure or base management decisions of Spirit Lake on accurate information." ECF 30 at 40. The Court should reject this request for two reasons. First, the usual remedy in record review cases is to vacate and remand the final agency action back to the agency. 5 U.S.C. § 706(2)(A) (providing that a "reviewing court" "*shall* hold unlawful and set aside" illegal agency action) (emphasis added); *All. for the Wild Rockies v. USFS,* 907 F.3d 1105, 1121 (9th Cir. 2018). Courts only depart from the presumptive remedy of vacatur "when equity demands," *Pollinator Stewardship Council v. U.S. E.P.A.*, 806 F.3d 520, 532 (9th Cir. 2015), and only in "rare circumstances" not present here. *Oregon Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 575 (9th Cir. 2016).

Second, the Forest Service does not identify the "highly disruptive consequences" to which it refers. While the tunnel and gate need to be repaired, there is in fact no immediate urgency to this need. AR 02983 (complete failure is unlikely and sufficient advance notice of problems is assured). Therefore, the presumptive "public safety"[8] rationale offered by the Forest Service is insufficient to overcome the typical remedy in administrative record cases such as this one.

## VI.   CONCLUSION.

For the forgoing reasons, the Court should GRANT Plaintiffs' motion for summary judgment. Respectfully submitted and dated this 29th day of October, 2021.

/s/ Susan Jane M. Brown
Susan Jane M. Brown (OSB #054607)
Western Environmental Law Center
4107 NE Couch St.
Portland, Oregon 97232
Ph. (503) 914-1323
brown@westernlaw.org

*Attorney for Plaintiffs*

---

[8] The Forest Service's emphasis on public safety as the reason to eschew the typical remedy in a record review case belies its rebuttal argument that the public safety implications of the Project are insufficient to compel the preparation of an EIS: the agency cannot have it both ways.