1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

10

11  CASCADE FOREST CONSERVANCY,        CASE NO. 3:21-cv-5202-RJB
    GREAT OLD BROADS FOR
12  WILDERNESS, WASHINGTON NATIVE      ORDER ON MOTIONS FOR
    PLANT SOCIETY, SIERRA CLUB, DR.    SUMMARY JUDGMENT
13  JOHN BISHOP, DR. JAMES E. GAWEL,
    and SUSAN SAUL,

14                        Plaintiffs,

15          v.

16  UNITED STATES FOREST SERVICE,

17                        Defendant.

18          This matter comes before the Court on Plaintiffs' Motion for Summary Judgment (Dkt.

19  18) and Defendant's Cross-Motion for Summary Judgment (Dkt. 30).  The Court has considered

20  the pleadings filed in support of and in opposition to the motions and the file herein.  The

21  Parties' request oral argument, but it is unnecessary to fairly decide the motions.[1]

22

23  _____
    [1] Pursuant to Local Civil Rule 7(b)(4), "[u]ness otherwise ordered by the court, all motions will be decided by the
24  court without oral argument."  Because the matters have been fairly and fully briefed, oral argument is unnecessary.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT - 1

Plaintiffs bring this lawsuit challenging a planned action by the United States Forest Service under the Administrative Procedure Act.  The challenged action intends to address the threat posed by a potential catastrophic breach of Spirit Lake near Mount St. Helens in Washington State.  It involves building a temporary access road to reach Spirit Lake, and then using crews and machinery to do geotechnical drilling and maintenance work.  For the reasons set forth in this Order, the Forest Service complied with the Administrative Procedure Act when crafting its plan, and Plaintiffs' claims should be dismissed.

## I.   RELEVANT FACTS AND PROCEDURAL HISTORY

### A.  FACTS

#### 1.  Background on Spirit Lake

The eruption of Mount St. Helens in 1980 was a "transformative event."  AR 02980. Debris from the blast and subsequent volcanic flows destroyed forested landscape, river channels, bridges, roads, and other infrastructure for hundreds of kilometers.  *Id.*  It killed at least 57 people, caused over $1 billion in damage, and completely transformed the surrounding landscape.  *Id.*; AR 02982.  This incredible event and its unique geological setting prompted Congress to make it a national monument in 1982. AR 00695.  The Mount St. Helens National Volcanic Monument (Monument) exists "to protect distinctive features and processes for public education, interpretation and recreation, and for research."  AR 00448.

Spirit Lake sits within the Monument – just north of Mount St. Helens and well within the zone that experienced "a massive debris avalanche."  *Id.*  Avalanche debris both filled the bottom of Spirit Lake, raising the lake level by about two-hundred feet, and created a dam blocking its natural outlet.  *Id.*; AR 03380.  By August 1982, the lake level reached alarming levels and was predicted to breach the top of the debris blockage in or before December 1985.

AR 03082.  Current estimates are that, among other things, "[a] catastrophic break of the blockage could release more than 300,000 acre-feet of water and 2.4 billion cubic yards of sediment, rivaling the devastating mudflows of the 1980 eruption (NASEM 2017).  A flood of this magnitude would likely inundate the Port of Longview for several months and temporarily close the ports of Portland, Vancouver, and Kalama."  AR 05547.  Such an event would again transform the area and would likely lead to loss of life and enormous economic damages.  AR 03029.

To prevent such a breach, the United States Army Corps of Engineers "implemented an emergency pumping operation in November 1982," consisting of "barge-mounted pumps to pump lake water through a conduit buried across the debris blockage."  AR 03028.  For a more permanent solution, the Corps then bored "a 2600-m (8,500-ft) long tunnel extending from the west side of Spirit Lake through Harry's Ridge and into the valley of South Coldwater Creek."  *Id.*  "Despite the overall success of the existing tunnel, major repairs in 1995, 1996, and 2016 required extended closures of the tunnel gate and outlet flow, which allowed the lake to rise to the maximum safe operating level."  AR 05543.

2.  <u>Background on the Spirit Lake Tunnel Intake Gate and Geotechnical Drilling Project</u>

Due to deterioration of the tunnel infrastructure over the decades, the Forest Service decided it must act "to ensure the protection of public safety, health, property, and the environment from a catastrophic breach of the Spirit Lake natural debris blockage caused by the 1980 debris avalanche."  AR 05544.  In took the first step in 2018, by providing motorized utility-terrain vehicle access to the lake shore (2018 UTV Project) for tunnel operations and maintenance.  AR 05543; *see* AR 03873–889.  The second step involves geotechnical investigation and core sampling, something the Forest Service believes is important to "better

1    understand the geologic structure of the debris blockage and what might happen if the blockage

2    began to breach and/or its potential suitability as a location for an alternative outflow for Spirit

3    Lake." AR 04043. Forest Service leadership, however, decided it needed to do more analysis

4    about potential impacts, and it did that throughout 2019. *Id.* Informed by the 2018 UTV Project,

5    the Forest Service also learned that the tunnel inlet structure needed repairs. AR 05544. The

6    project at issue incorporates both geotechnical investigation and intake structure repairs. AR

7    05536–618.

8        In April 2020, the Forest Service issued an Environmental Assessment (EA) for the Spirit

9    Lake Tunnel Intake Gate Replacement and Geotechnical Drilling Project (the Project). AR

10   05536–618. The EA explores different possible actions, but the alternative ultimately selected

11   proposes building a temporary access road primarily along the route used by the U.S. Corps of

12   Engineers during construction in the 1980s. *See* AR 05562 (discussing the selected proposal as

13   "Alternative B"); AR 06283–324 (Decision Notice). This route is currently a hiking path known

14   as the Truman Trail. AR 05585. The Truman Trail, and by extension the temporary access road,

15   runs through an area called the Pumice Plain. The Pumice Plain is the "[s]ingle [m]ost important

16   site on the [M]onument." AR 04502. It was completely destroyed by the 1980 eruption, and its

17   development has helped researchers "document how biological communities assemble from

18   scratch." *See id.*

19       To assess potential impact on the Pumice Plain by the temporary access road, the Forest

20   Service calculated a disturbance corridor and considered probable effects. AR 05556, 06296.

21   Researchers considered a ground disturbance corridor of 33 to 100 feet from the proposed

22   centerline. *Id.* Considering that the road will be about sixteen-feet wide, single-lane with

23   periodic turnouts and turnarounds, the disturbance corridor will be 66 to 200 feet for the length

24

of the approximately 3.4-mile road. *Id.* The road will include culverts or bridges to separate

flowing water from the road surface and geosynthetic material to avoid contamination and

minimize disturbance to streambeds. *Id.* It will also "where possible" avoid and protect key

research areas. AR 06303. Nonetheless, effects from building and use of the road will include

removal of minor amounts of vegetation, increased sediment delivery at stream crossings, and

potential increased erosion or stream widening. AR 6114. The road will be removed at the end

of the Project and the area rehabilitated by removing non-native material, restoring natural

ground contours and drainage patterns affected by Project work, and revegetating the area. *See*

AR 06297, 05561.

To do geotechnical investigation and core sampling, the Forest Service will construct a

barge loading facility on the shoreline of Spirit Lake and a staging area upland, with the

temporary access road connecting the two. AR 06296. About three to five drilling vehicles and

30 onsite personnel will be used to do core sampling. AR 06297. Drilling will occur at about 30

locations within the footprint of drilling that occurred in 1982–83. *Id.* Some mud and water will

be disturbed and disposed of by drilling operations. *Id.* The Forest Service will also do

rehabilitation work in these areas after the Project is complete. *Id.*

3. The Forest Management Plans

As previously noted, Spirit Lake and the Pumice Plain fall within the Mount St. Helens

National Volcanic Monument. The Forest Service manages the Monument "as a separate unit

within the boundary of the Gifford Pinchot National Forest in accordance with the appropriate

laws pertaining to the national forest system…." AR 00079. To administer the Monument, the

Forest Service adopted its Comprehensive Management Plan in 1985. AR 00436–43.

The Monument Plan, which is incorporated into the Land and Resources Management Plan for the larger Gifford Pinchot National Forest, AR 00941, designates the Pumice Plain as a Class 1 Research Area.  AR 06290.  The Monument Plan, the Forest Plan, and the designation as a Class 1 Research Area all set standards and guidelines for activities within the Pumice Plain.  *See* AR 06287–89.  In addition, the Pumice Plain falls within the habitat range of the Northern Spotted Owl, which means activities in it must comply with the Northwest Forest Plan.  *See* AR 06289.

The Forest Service assessed whether the Project would comply with these regulations and found that it would except for a provision requiring visual quality retention within the Monument.  *See* AR 06294, 06283–324 (Decision Notice).  The Forest Service issued a Project-specific amendment to the Monument Plan to allow deviation from the visual quality objective in the area and for the duration of the Project.  AR 06294.

**B.  PENDING MOTIONS AND ORGANIZATION OF OPINION**

Plaintiffs bring this lawsuit seeking a declaration that the Spirit Lake Project Environmental Assessment, AR 05536–618, Decision Notice, AR 06283–324, and Finding of No Significant Impact, AR 06326–34, violate the National Forest Management Act, the National Environmental Policy Act, and the Administrative Procedure Act.  Both Parties move for summary judgment on all issues.  In addition, the Forest Service moves to strike extra-record declarations Plaintiffs filed in support of their motion for summary judgment.  This Order is organized by issue and will first discuss general legal standards, then Defendant's motion to strike, Plaintiffs' National Forest Management Act claims, and finally Plaintiffs' National Environmental Policy Act claims.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

## II.     DISCUSSION

### A.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt.").  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 253 (1986); *T.W. Elec. Serv. Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question.  The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial, which is a preponderance of the evidence in most civil cases.  *Anderson,* 477 U.S. at 254; *T.W. Elect.,* 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party.  The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W. Elect.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255).

B. **ADMINISTRATIVE PROCEDURE ACT (APA) STANDARDS**

Courts review agency decisions alleged to violate the NFMA and NEPA under the Administrative Procedure Act (APA). *Env't Prot. Info. Ctr. v. United States Forest Service*, 451 F.3d 1005, 1008–09 (9th Cir. 2006). "Under the [APA], a reviewing court can only reverse an agency decision if that decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *League of Wilderness Defenders Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1130 (9th Cir. 2010) (quoting 5 U.S.C. § 706(2)(A)). This standard is "highly deferential" to the agency decision, especially when reviewing technical analysis and judgments based on scientific expertise. *Id.* (citing *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008)). Essentially, this standard requires the court to "ask whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Pac. Coast Fed. of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001) [hereinafter *PCFFA*].

C. **STANDING/DEFENDANT'S MOTION TO STRIKE**

As a threshold issue, the Forest Service moves to strike extra-record declarations Plaintiffs filed in support of their Motion for Summary Judgment. Judicial review of an administrative agency decision typically focuses the administrative record. *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005). There are narrow exceptions to this general rule that permits review of extra-record evidence." *Id.* at 1031. The burden is on the plaintiff to show that one of the exceptions applies. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992–93 (9th Cir. 2014).

Plaintiffs argue that the extra-record declarations should be permitted to establish standing, Dkt. 32 at 7, and, though the Forest Service does not challenge Plaintiffs' standing, it

concedes the documents may be considered for that purpose, Dkt. 33 at 5. Therefore, the Court

considers Plaintiffs' extra-record declarations for the limited purpose of deciding standing. The

Court finds that Plaintiffs demonstrate injury that is casually connected to the conduct

complained of and that would be redressed by a favorable decision, and therefore have standing.

*See Lujan v. Def. of Wildlife*, 504 U.S. 555, 560–61 (1992). The Forest Service's motion to

strike should otherwise be granted.

### D. NATIONAL FOREST MANAGEMENT ACT (NFMA)

The NFMA requires the Forest Service to "develop, maintain, and, as appropriate, revise

land and resource management plans for units of the National Forest System. . . ." 16 U.S.C. §

1604(a). These "Forest Plans" establish management standards, guidelines, and goals for

specified areas of the National Forest System. *See generally* 16 U.S.C. § 1604; *Native Ecosys.*

*Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012). Any action taking place within the

National Forest System must comply with the governing Forest Plan. *See id.* "[T]he Forest

Service's interpretation and implementation of its own forest plan is entitled to substantial

deference." *Id.* That deference may be set aside only where the agency's position is "contrary to

the clear language" of the governing plan. *Native Ecosys. Council v. U.S. Forest Serv.*, 418 F.3d

953, 962 (9th Cir. 2005).

Plaintiffs argue that the Forest Service violated the NFMA in two ways: (1) by violating

the Northwest Forest Plan's (NFP) Aquatic Conservation Strategy (ACS); and (2) by failing to

properly amend the Comprehensive Management Plan for the Mount St. Helens National

Monument.

### 1. Northwest Forest Plan's Aquatic Conservation Strategy

In 1994, the Forest Service and Bureau of Land Management approved the NFP, which

1  applies to any federal forest land within the range of the northern spotted owl.  *See* AR 01441;

2  *PCFFA*, 265 F.3d at 1031.  One component of the NFP is the ACS, which "was developed to

3  restore and maintain the ecological health of watersheds and aquatic ecosystems contained

4  within them on public lands."  AR 01456.  The ACS requires agencies "manage the riparian-

5  dependent resources to maintain the existing condition or implement actions to restore

6  conditions."  AR 01457.  Management actions that do not maintain the existing condition or do

7  not lead to improved conditions in the long term . . . should not be implemented."  *Id.*  To make

8  this assessment, the ACS includes nine "maintain and restore" objectives.  AR 01457–58.

9       Plaintiffs argue that the Forest Service violated six ACS objectives.  Before considering

10  those objectives, however, the Court must resolve the Parties' dispute about what constitutes a

11  violation.

12       Plaintiffs argue that a de minimis impact on an ACS objective demonstrates a violation.

13  Dkt. 32 at 10–11 ("[T]he ACS does not permit de minimis violations of its requirements.")

14  (citing *PCFFA*, 265 F.3d at 1037).  Plaintiffs, however, misapply caselaw and come to an

15  incorrect conclusion.  In *PCFFA*, the case cited by Plaintiffs, the Ninth Circuit held that an

16  agency acts arbitrarily and capriciously if it disregards the effects of a proposed action as

17  "localized" when the effects can be significant when aggregated with effects from other

18  activities.  265 F.3d at 1037.  This means that effects should be considered both on micro and

19  macro levels.  It does not stand for the proposition that a project having any impact whatsoever

20  on an ACS objective violates the ACS.

21       Despite the appearance of further disagreement, the Parties generally agree on what an

22  agency must do to comply with the ACS.  *See* Dkts. 30 at 22 and 32 at 9.  The ACS requires

23  agency actions maintain or lead to improved conditions "in the long term."  AR 01457.  Making

24

that assessment requires considering the short and long-term effects of the individual project in conjunction with other activities that could create compounding effects. *See PCFFA*, 265 F.3d at 1037. Hard rules like only "degradations that persist more than a decade and are measurable at the watershed scale will be considered to degrade aquatic habitat," *id.*, or that "any negative impact at all demonstrates noncompliance with the ACS" do not fit into this type of inquiry. *See* AR 01457; *Bark v. Northrop*, Case No. 3:13-cv-00828-AA, 2016 WL 1181672, at *16 (D. Or. 2016) ("[T]he fact that the Project may cause short-term sediment impacts does not mean that the project will cause degradation . . . If that was the case, no agency action near Riparian Reserves would ever be allowed."); *Bowler v. U.S. Bureau of Land Mgmt.*, Case No. 11-cv-6037-HO, 2011 WL 4962150, at *6 (D. Or. 2011) ("Thus, while the record shows this project will result in some short-term increased flow velocities and decreased fish habitat availability, that evidence is insufficient to demonstrate ACS noncompliance or agency action that is arbitrary or capricious.").

In short, the ACS demands that an agency thoroughly consider whether a proposed action will negatively impact the ecological health of watersheds and aquatic ecosystems, an assessment guided by ACS' nine listed objectives. AR 01456. If an agency either does not consider the impact on watershed and aquatic ecosystems or does not articulate a rational connection between the facts and its decision, then its decision violates the APA. *See PCFFA*, 265 F.3d at 1034, 1037.

Plaintiffs challenge the Forest Service's assessment of ACS objectives 2, 3, 4, 5, 8, and 9, all of which the Forest Service considered and rationally found would continue to be maintained and restored despite localized and short-term negative effects.

a. **Objective 2**

Objective 2 requires the Forest Service to "[m]aintain and restore spatial and temporal connectivity within and between watersheds. Lateral, longitudinal, and drainage network connections include flood plains, wetlands, upslope areas, headwater tributaries, and intact refugia.  These network connections must provide chemically and physically unobstructed routes to areas critical for fulfilling life history requirements of aquatic and riparian-dependent species." AR 01457.

The Forest Service concluded that the "proposed activities . . . will have localized but minor effects to the overall continuing positive trajectory of recovery at the watershed and landscape scale."  AR 05651.  Plaintiffs argue that the Forest Service's conclusion is arbitrary and capricious because the proposed road will be adjacent to and cross numerous waterways and use of the barge loading area will harm habitat along Spirit Lake's south shore.  Dkt. 18 at 24. They cite to an expert report made for a different project, the 2018 UTV Project, that found "road construction will 'likely further alter the natural flow regime, change patters of erosion and deposition of sediments and, potentially result in the deposition of large cobbles and sediment downstream during future high flow events." *Id.*; *citing* AR 03992.  Having been developed for another project, this assessment lacks weight, and Plaintiffs also take the quote out of context. The full citation reads:

> *The largest potential impacts to aquatic studies and associated biota would likely result from the use of rock fills, if utilized during implementation*, to armor stream and wetland crossings.  This could also likely further alter the natural flow regime, change patters of erosion and deposition of sediments and, potentially result in the deposition of large cobbles and sediment downstream during future high flow events.  *As such no import material will be allowed for this project and no fill will be used in stream channels*.  Research studies of both aquatic systems and associated biota could also be impacted by the comparatively small but more frequent input of sediment and nutrients resulting from the repeated passage of UTVs and ATVs over small streams, seeps, and springs.

AR 03992 (emphasis added).  Both of Plaintiffs' miscitations are significant.

Turning to this Project, Plaintiffs argue that the Forest Service improperly relied on mitigation efforts to support its conclusion because mitigation efforts are not a substitute for preventing habitat degradation.  Dkt. 32 at 11 (citing AR 01507).  Plaintiffs are correct that efforts to mitigate damage do not negate damage that nonetheless occurs.  Agencies, however, must consider the probable effects, and mitigation plans are relevant to that assessment because they influence the probable effects.

The Project includes plans to mitigate damage by building culverts and bridges at stream crossings "to separate live stream flows from the temporary access road surface," AR 06296, using geosynthetic material "to avoid negative channel changes such as inlet scouring or erosion of streambed or downstream banks," *id*, and continuing to work with the Washington Department of Fish and Wildlife to implement and maintain best practices, AR 06300.  *See* AR 06111–16.  There are also plans to rehabilitate and restore the area after the Project is complete. AR 06114–15.  These plans impact the probable effects.

The Forest Service considered probable effects, including short-term increase in water temperature caused by removing minor amounts of riparian vegetation, increased soil and sediment in stream channels and crossings, and potential erosion and stream widening.  *Id*.  It also considered probable effects within the context of the temporary access road, the barge loading area, and the area as a whole.  *Id*.

While there will be some negative impact to watershed connectivity, the record supports the Forest Service's conclusion that overall maintenance and recovery of watershed connectivity in the area will continue despite Project activities.

**b.  Objective 3**

Objective 3 requires the Forest Service to "[m]aintain and restore the physical integrity of the aquatic system, including shorelines, banks, and bottom configurations."  AR 01457.

According to Plaintiffs, "[t]he Project will not meet this Objective because it requires dredging of Spirit Lake and redeposition of dredged materials into the lake and on the lake shore[.]"  Dkt. 32 at 11.  Plaintiffs' argument rests on the proposition that any alteration or de minimis impact on the Lake's physical structure constitutes an ACS violation.  *Id.*  As discussed above, this is not so.

The proposed dredging would relocate approximately "3 to 4 acre-feet of spoils into Spirit Lake's bottom," which accounts for 0.0012 percent of the total volume of Spirit Lake (239,000 acre-feet)."  AR 05594.  Aside from that physical disruption, the record does not indicate any particularly concerning possible effects.  Considering these facts and the record as a whole, the Forest Service's conclusion that the existing aquatic system will "be maintained on a positive trajectory towards recovery at the watershed and landscape scale" is reasonable.

### c.  Objective 4

Objective 4 requires the Forest Service to "[m]aintain and restore water quality necessary to support healthy riparian, aquatic, and wetland ecosystems.  Water quality must remain within the range that maintains the biological, physical, and chemical integrity of the system and benefits survival, growth, reproduction, and migration of individuals composing aquatic and riparian communities."  AR 01457.

Plaintiffs again cite to a report issued for the Duck Bay Project to support their argument. Dkt. 18 at 26 (citing AR 03279, 03294, 03298–99).  Nonetheless, the Forest Service thoroughly considered the potential impacts on water quality, including water temperature, turbidity or sediment, and chemical inputs.  AR 05652, 06111–16.  For example, it found that dredging

1   activity will cause material that already exists at the Spirit Lake tunnel to be deposited at the lake

2   bottom, which will cause short-term turbidity.  AR 06114.  In addition, the risk of "accidental

3   introduction of petroleum products from motorized equipment" is higher than no action, but it is

4   still "low."  AR 06115.

5       Plaintiffs speculate that dredging and disposing of drilling mud "may change the

6   chemical integrity of water quality" and "given the very rugged terrain on the Pumice Plain, the

7   number of required equipment passes, and the duration of the project, petroleum and other

8   chemical contamination is likely."  Dkt. 32 at 12 (citing AR 03298–99).  The Forest Service,

9   however, considered these risks, and Plaintiffs' speculation is not enough to overcome the

10  deference the Court must give to the Forest Service's conclusions.

11      From the facts on the record, it is rational to conclude that the proposed Project activities

12  will not push the water quality outside of the range that maintains the biological, physical, and

13  chemical integrity of the water system.

14      **d.  Objective 5**

15      Objective 5 requires the Forest Service to "[m]aintain and restore the sediment regime

16  under which aquatic ecosystems evolved.  Elements of the sediment regime include the timing,

17  volume, rate, and character of sediment input, storage, and transport."  AR 01457.

18      Increased sediment deposits are a Project concern.  *See* AR 04337; AR 06112–16.  As

19  Plaintiffs emphasize, the Pumice Plain does not have a robust soil profile, so footsteps,

20  construction, and road use will affect the timing and volume of sediment movement in the area.

21  Dkt. 18 at 26.  Activity could increase or alter sediment delivery to streams and Spirit Lake.  *Id.*

22  At issue, however, is whether the Forest Service considered the potential impacts and reasonably

23

24

1   concluded they would not frustrate the ultimate objective of maintaining and restoring the

2   sediment regime.  It did.

3         The Forest Service considered the potential impact on the area, AR 06112–116, noted

4   that sediment movement is high under natural conditions, AR 05652, and found that the

5   increased risk of sediment delivery would be "limited in size and scope," AR 06114.  Ultimately,

6   the Forest Service concluded that the "[t]iming, volume, rate, and character of sediment input,

7   storage, and transport continue to be mostly and primarily maintained."  AR 05652.  Plaintiffs

8   disagree but, again, the Forest Service's conclusion receives deference.  Plaintiffs do not put

9   forth sufficient evidence to demonstrate that the Forest Service's conclusion that the effects from

10  sediment movement caused by the Project will not clearly disrupt the health of the sediment

11  regime on the Pumice Plain or Spirit Lake was unreasonable.

12        **e.   Objective 8**

13        Objective 8 requires the Forest Service to "[m]aintain and restore the species composition

14  and structural diversity of plant communities in riparian areas and wetlands to provide adequate

15  summer and winter thermal regulation, nutrient filtering, appropriate rates of surface erosion,

16  bank erosion, and channel migration and to supply amounts and disruptions of coarse woody

17  debris sufficient to sustain physical complexity and stability."  AR 01457–58.

18        Plaintiffs argue that this objective will not be met because removing native vegetation

19  around aquatic features on the Pumice Plain will not maintain or restore the species composition

20  and structural diversity of plant communities.  Dkt. 18 at 27.  Some vegetation will indisputably

21  be removed because of the Project, especially for construction of the temporary road.  AR 05655.

22  As previously discussed, activity that negatively affects riparian areas does not violate the ACS

23  unless it harms maintenance or restoration in the long run.

24

1    The Forest Service considered the probable effects, found that "[d]isturbance would be

2    minimal compared to the overall stream length, vegetative cover, and size of contributing

3    drainage area."  AR 06322.  It also found that "[a]ll sites where vegetation and soil disturbance

4    has occurred as a result of the proposed actions will be returned to a natural contour and

5    revegetated with plant material saved from initial construction."  AR 06303.  It is reasonable to

6    conclude from this that the health, stability, and composition of the plant communities will be

7    maintained.

8         **f.   Objective 9**

9         Finally, Objective 9 requires the Forest Service to "[m]aintain and restore habitat to

10   support well-distributed populations of native plant, invertebrate, and vertebrate riparian-

11   dependent species."  AR 01458.

12        Plaintiffs argue that the Project will not meet this objective because it will increase spread

13   of the New Zealand Mud Snail, alter stream geomorphology and processes through increased

14   sedimentation, and destroy native plant species.  Dkt. 32 at 15.  As with the other objectives, the

15   Forest Service considered these risks, found they could be adequately controlled, and that they

16   would not interfere with maintenance of this objective.  For example, New Zealand Mud Snails

17   are already in the area, and the Forest Service reasonably concludes that measures it plans to take

18   to reduce the risk of spread will be adequate.  AR 06291; AR 06301.  The Forest Service also

19   found that individual rainbow trout may be affected, but not overall populations.  *See* AR 06112.

20   The Forest Service considered the probable effects and rationally concluded that the Project

21   would maintain habitat to support well-distributed populations of native plant, invertebrate, and

22   vertebrate riparian-dependent species.

23

24

1
### g. Conclusion

2      In sum, the Forest Service did not act arbitrarily, capriciously, or contrary to law when

3 considering the ACS Objectives because it considered the probable effects and came to

4 reasonable conclusions.

5
## 2. THE FOREST PLAN

6      The Mount St. Helens National Monument Comprehensive Management Plan, which is

7 part of the broader Gifford Pinchot Forest Land and Resource Management Plan (Forest Plan),

8 includes a Retention Visual Quality Objective (RVQO).  AR 00475.  "Retention" requires that

9 "management activities are not evident to the casual forest visitor."  AR 05575.  The Forest

10 Service determined that the Project "would not be consistent" with the RVQO and issued a

11 Project-specific amendment to permit variance from the RVQO only for the approximately 475

12 acres affected by the Project and for the duration of the Project.  AR 06312.

13      Federal regulations (Plan Rules) govern the process for amending a Forest Plan.  36

14 C.F.R. § 219.13. Pursuant to the Plan Rules:

15      A plan may be amended at any time.  Plan amendments may be broad or narrow,
       depending on the need for change, and should be used to keep plans current and
16      help units adapt to new information or changing conditions.   The responsible
       official has the discretion to determine whether and how to amend the plan and to
17      determine the scope and scale of any amendment.

18 36 C.F.R. § 219.13(a).

19      There are, however, certain requirements an agency's "responsible official" must take

20 before making an amendment.  Notably, the official:

21      shall . . . [d]etermine which specific substantive requirement(s) within §§ 219.8
       through 219.11 [sustainability, diversity of plant and animal communities, multiple
22      use, and timber] are directly related to the plan direction being added, modified, or
       removed by the amendment and apply such requirement(s) within the scope or scale
23      of the amendment.  The responsible official is not required to apply any substantive
       requirements within §§ 219.8 through 219.11 that are not directly related to the
24      amendment.

1   36 C.F.R. § 219.13(b)(5).

2        Plaintiffs essentially raise two arguments to challenge the Project-specific amendment.

3   First, they argue that the Plan Rules do not permit project-specific amendments at all.  Dkt. 32 at

4   16.  In other words, they argue that the Forest Plan must be more broadly amended any time an

5   activity will not meet its requirements.  This is not correct.

6        Plaintiffs cite to the Final Rule discussion in the Federal Register to claim that the

7   Department of Agriculture specifically "reject[ed] the position that projects may be exempted

8   from plan requirements through project-level amendments."  *Id.*  They cite to a page but do not

9   use a quotation, and it is not clear what Plaintiffs are referencing because the most relevant text

10  on that page is directly contrary to their point.  It reads: "amendments 'could range from project

11  specific amendments or amendments for one plan component, to the amendment of multiple plan

12  components.' (77 FR 21161, 21237, April 9, 2012)."  *National Forest System Land Management*

13  *Planning*, Final Rule, 81 Fed. Reg. 90,723, 90,725 (Dec. 15, 2016).  Plaintiffs' argument is also

14  inconsistent with the Plan Rules' final text, which states, "plan amendments may be broad or

15  narrow, depending on the need for change.'"  *Id.* (quoting 36 C.F.R. § 219.13(a)).  A project-

16  specific amendment fits comfortably into the description of a narrow amendment based on the

17  need for change.

18       Plaintiffs attempt to support this argument with a variety of other justifications.  They

19  assert that permitting project-specific amendments violate the NFMA statute, which requires

20  "one integrated plan for each unit of the National Forest System, incorporating in one document

21  or one set of documents, available to the public at convenient locations, all of the features

22  required by this section."  Dkt. 32 at 16, 16 U.S.C. § 1604(f)(1).  This argument is also

23  misplaced.  A project-specific amendment can be incorporated into the Plan; it merely amends

24

1   the Plan.  *See* 81 Fed. Reg. at 90,725 ("Unlike a plan revision, a plan amendment does not create

2   a new plan; it results in an amended plan with the underlying plan retained except where changed

3   by the amendment.").  This rule requires that forest plans be organized, integrated, and available

4   to the public; it does not prohibit project-specific amendments.  Plaintiffs contend that a project-

5   specific amendment is unlawful because it would suspend application of the RVQO.  Dkt. 32 at

6   16–17.  This cannot be.  By nature, project-based amendments exist because the Forest Service

7   expects activity will be inconsistent with the forest plan.  If activities were consistent with the

8   forest plan, then there would not be a "need for change."  *See* 36 C.F.R. § 219.13(a).

9        The Forest Service's discretion to make plan amendments, however, is not "unbounded."

10  81 Fed. Reg. at 90,725.  It must consider whether requirements listed in 36 C.F.R. § 219.13(b)(5)

11  "directly relate" to the proposed amendment, and, if they do, then it must "apply those

12  requirements within the scope and scale of the amendment."  In other words, the Forest Service

13  must consider how an amendment will affect certain issues, including sustainability and aesthetic

14  qualities, and tailor amendments accordingly.  *See* 81 Fed. Reg. at 90,725.  Substantive

15  requirements that do not directly relate to the amendment do not need to be considered when

16  crafting the amendment.  36 C.F.R. § 219.13(b)(5).

17       Plaintiffs' second argument stems from the Forest Service's application of these

18  substantive requirements to the proposed amendment, though they mix issues in a way that

19  makes it difficult to parse.  They rely on two Fourth Circuit cases that considered whether the

20  Forest Service properly analyzed whether substantive requirements directly related to a proposed

21  amendment.  *See Sierra Club, Inc. v. U.S. Forest Service*, 897 F.3d 582, 601–02 (4th Cir. 2018);

22  *Cowpasture River Pres. Ass'n v. Forest Service*, 911 F.3d 150, 161–62 (4th Cir. 2018).  In both

23  cases, the court determined that the Forest Service did not use the proper analysis and erred by

24

1    finding that the substantive requirements were not "directly related" to the proposed

2    amendments.  *Sierra Club*, 897 F.3d at 603; *Cowpasture*, 911 F.3d at 162–62.

3        Plaintiffs' reliance on these cases is misplaced because in this matter the Forest Service

4    found substantive requirements directly related to the proposed amendments.  Plaintiffs appear to

5    use these cases to emphasize a requirement that is also in the Final Rule, which is that the Forest

6    Service must apply directly related substantive requirements within the scale and scope of the

7    amendment.  *See* Dkt. 32 at 18; *citing Sierra Club*, 897 F.3d at 600–01 ("the Forest Service was

8    required to both 'determine which specific substantive requirement(s) within §§ 219.9 through

9    219.11 are directly related to the plan direction being added, modified, or removed by the

10   amendment, *and then apply such requirement(s)* within the scope and scale of the amendment.");

11   *see also* 36 C.F.R. § 219.13(b)(5).  The Forest Service did this.

12       The Forest Service found that the Project will violate the RVQO because casual visitors

13   would see machinery and workers during the construction and maintenance of the temporary

14   access road and drilling activities, which "would draw attention to the work and temporarily

15   detract from the natural-appearing landscape."  AR 05575.  It then issued a Project-specific

16   amendment to the RVQO to permit a variance from the visual retention goal for approximately

17   465 acres (less than 0.5 percent of the Monument) for the duration of the Project.  *Id.*; AR 06313.

18       The Forest Service concluded that two substantive requirements directly relate to the

19   Project amendment: § 219.8(b)(2), sustainable recreation, including recreation settings,

20   opportunities, access, and scenic character; and § 219.10(a)(1), "aesthetic values, air quality,

21   cultural and heritage resources, ecosystem services…."  Both require that forest plans include

22   plan components, including standards or guidelines, to support these requirements.  *See* 36

23   C.F.R. §§ 219.8(b); 219.10(a).

24

1   After determining these substantive requirements directly related to the amendment, it

2   applied them within the scope and scale of the amendment, which is limited in time (Project

3   duration) and scope (less than 0.5 percent of the Monument).  AR 06313.  The Forest Service

4   found that "the [P]roject specific amendment will meet the overarching goals of the substantive

5   requirements related to 36 C.F.R. 219.8(b)(2) and 219.10(a)(1)," because the Project amendment

6   only suspends the RVQO in a small portion of the Monument and for a finite time.  AR 06313.

7   Overall, goals of sustainable recreation and aesthetic values as applied to the RVQO will still be

8   met despite the Project amendment.  It other words, the Forest Service determined it did not need

9   to draft new plan components because suspending the RVQO only for the Project duration does

10   not prevent the current plan components from being met overall.

11   The Forest Service both engaged in the correct procedural analysis and came to a

12   reasonable conclusion.  Plaintiffs disagree, but that is not sufficient to demonstrate that the Forest

13   Service acted arbitrarily, capriciously, or contrary to law.

14   **E.  NATIONAL ENVIRONMENTAL POLICY ACT (NEPA)**

15   "[NEPA] is a procedural statute intended to that ensure Federal agencies consider

16   environmental impacts of their actions in the decision-making process."  40 C.F.R. § 1500.1(a).

17   NEPA does this by requiring agencies to carefully consider information about how the proposed

18   action might impact the environment and by making relevant information available to the public.

19   *League of Wilderness*, 615 F.3d at 1135.  NEPA "exists to ensure a *process*;" it "does not impose

20   substantive requirements."  *Id.* (internal quotation omitted).  Courts reviewing an agency

21   decision consider "whether the agency took a sufficiently 'hard look' at probable consequences."

22   *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 734 (9th Cir. 2020) (quoting *Kern v.*

23   *U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1071 (9th Cir. 2002)).  Under this deferential

24

standard, courts "must defer to an agency's decision that is "fully informed and well-considered."" *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998) (citing *Save the Yaak Comm v. Block*, 840 F.2d 714, 717 (9th Cir. 1988)).

As part of the process required by NEPA, federal agencies generally must prepare an Environmental Assessment (EA) to assess how likely a proposed activity would be to have a significant effect on the human environment. 40 C.F.R. §§ 1501.3, 1501.5, 1508.9. This analysis must consider both the direct and indirect effects of the proposed action 40 C.F.R. § 1508.8, and its cumulative impact, 40 C.F.R. § 1508.7. If the agency finds that a significant impact is likely, then it must prepare an Environmental Impact Statement (EIS). 40 C.F.R. §§ 1501.5, 1508.9. On the other hand, if the agency concludes that the proposed project would not likely have a significant effect, it may produce a Finding of No Significant Impact (FONSI) instead of an EIS. 40 C.F.R. § 1508.13; *Env't Prot. Info. Ctr.*, 451 F.3d at 1009.

In this case, the Forest Service prepared an EA, AR 05536-5618, and produced a FONSI supporting its finding of no significant impact, AR 06326-34. According to Plaintiffs, the Forest Service violated NEPA by: (1) failing to consider the direct, indirect, and cumulative effects of the Spirit Lake Project in the EA, Dkt. 18 at 34; and (2) deciding to proceed with the Project without preparing an EIS, i*d.* at 47.

## 1. THE ENVIRONMENTAL ASSESSMENT (EA)

Direct effects are those "caused by the action and occur and the same time and place." 40 C.F.R. § 1508.8(a). Indirect effects are those "caused by the action and farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). "*Cumulative impact* is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency

1   (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result

2   from individually minor but collectively significant actions taking place over a period of time."

3         An EA must fully consider these issues, but it is nonetheless designed to be "a concise

4   public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining

5   whether to prepare an [EIS] or a [FONSI]," and to "[f]acilitate preparation of a[n] [EIS] when

6   one is necessary." 40 C.F.R. § 1508.9(a).

7         Plaintiffs argue the EA did not consider the direct, indirect, and cumulative effects: (1) of

8   geotechnical and core sampling on the Pumice Plain debris flow; (2) on the ongoing scientific

9   research that will be disrupted or precluded by implementation of the Project; and (3) of the

10  Spirit Lake Project in conjunction with the effects of past, present, and reasonably foreseeable

11  future actions.  Dkt. 18 at 34.

12                    **a.  Geotechnical Investigation and Core Sampling**

13        The EA describes the Geotechnical Investigation and Core Sampling element of the

14  Project in detail.  AR 05556–57.  The goal is to obtain data "to more accurately determine and

15  predict safe conditions for existing and possible future alternate systems to control water levels

16  in Spirit Lake."  AR 05552.  In other words, to better understand the nature of the debris

17  blocking the Spirt Lake outlet, what it is made of, where it begins and ends, how likely it is to

18  erode, and how these factors could affect future management plans.  AR 05546.  To accomplish

19  this, the Project will use three to five drill vehicles and approximately 30 personnel to take core

20  sampling from approximately 30 locations over the course of up to five field seasons.  AR

21  05556.  The core sampling would take place within the footprint of drilling that occurred during

22  the 1982–83 construction, and it would directly affect about 104 acres and indirectly disturb

23  about five acres.  *Id.*

24

1      The EA and supporting documents clearly considered the direct and indirect effects of

2  this activity.  *See* AR 06114.  For example, a hydrology report prepared for the EA considers

3  effects from the temporary access road and activity at the drill site, and it found both could

4  produce "minor effects."  *Id.*  The report further found that disposing of dredged material from

5  the lake "is expected to produce short-term turbidity [] limited to the area of the disposal site."

6  *Id.*  The EA notes that drilling would have visual impacts on the project area, AR 05575, that

7  "drill pads would impact soil formation," AR 05590, and that "geotechnical surveys may affect

8  individuals or habitat (rainbow trout) but will continue to maintain viable populations of these

9  species," AR 05600.  The EA also considered the cumulative impact of these effects with other

10  actions but found the impacts "do not lead to any additional measurable cumulative effects."  *See*

11  *e.g.*, AR 05570.

12      Plaintiffs concede that the Forest Service "allegedly" considered these effects, but they

13  contend the analysis failed to describe "the qualitative nature of the effect."  Dk. 32 at 18–20.

14  The EA, however, clearly provides notice of what the geotechnical sampling and core sampling

15  entails and of the probable consequences.  This qualifies as the "hard look" that NEPA requires.

### b.  Ongoing Scientific Research

17      The Parties dispute whether NEPA requires analysis of potential effects to research

18  projects (as opposed to the environment being researched).  *See* Dkts. 30 at 36 and 32 at 19.  This

19  dispute, however, is irrelevant because the Forest Service thoroughly considered potential effects

20  of the Project on research studies.  *See e.g.*, AR 05551 (noting "current and future research" was

21  one of the four "key issues" discussed in the EA); AR 05568–72 (EA Section 3.1 Research); AR

22  05689–05709 (Specialist Input: Research).

1       To make its assessment, the Forest Service considered information from a variety of

2  sources including specialist reports, questionnaire responses from active scientists, and input

3  from various researchers and the public.  AR 05694–95.  It found that "[t]here are currently 30

4  different studies occurring in the area, totaling 992 individual research 'plots' varying in size,

5  shape, and distribution."  AR 05569; AR 05700.  Of those plots, 85 may be impacted: 2 at the

6  drilling area, 25 by the temporary access road, which "will see the largest amount of disturbance

7  and impact," and an additional 58 that could see direct effects if the temporary access road were

8  to shift and may see indirect effects from road construction and use.  *Id.*; AR 05698.  This

9  equates to impact on 8.5 percent of research plots, meaning 91.5 percent of plots would not be

10  impacted.  *Id.*  Of the 30 active studies, 19 have at least one plot within the potential disturbance

11  corridor.  AR 05569; AR 05700.  Potential effects generally "may include erosion, sediment

12  deposits, dust, animal habitat and behavior disturbance, altered hydrology or soil moisture, and

13  invasive species introduction or spread."  AR 05569.  While "[t]he physical environment is

14  expected to return to the pre-project conditions 2 to 15 years after project implementation," so

15  impact on the environment will be temporary, the Forest Service acknowledges that some

16  impacted plots may no longer be useful in their studies because their developmental history

17  would differ from the other plots.  *Id.*; AR 05699.

18       This is a thorough analysis that demonstrates the Forest Service took a hard look at

19  Project activities and probable consequences for research studies.  Accordingly, the Court must

20  defer to its decision.

21              **c.  Cumulative Effect**

22       Finally, Plaintiffs argue the EA failed to consider the cumulative effects of the Spirit

23  Lake Project in conjunction with a 2018 Duck Bay UTV Project and with the long-term

24

management plan for Spirit Lake.[2]  Dkt. 18 at 36.  The Forest Service, however, adequately considered both.

In 2018, the Forest Service approved a project to provide motorized, utility terrain vehicle (UTV) access to Duck Bay on Spirit Lake via a seasonally flowing creek.  AR 03873–87.  The Forest Service approved this project to address "the need to provide safe, efficient, administrative access to the south shoreline of Spirit Lake for operations, maintenance and repair of the tunnel intake structure."  AR 03873.  In the EA for the UTV Project, the Forest Service explained that "[t]his route has very little impact on ongoing research on the Pumice Plain and was suggested by the research community as an alternative route across the Pumice Plain using the Truman Trail."  AR 03875.  In the EA for the Spirit Lake Project currently at issue, the Forest Service considered and rejected a route to Spirit Lake that would partially travel down a seasonally flowing creek bed to access Duck Bay on Spirit Lake.  AR 05564 ("Alternative C").  The Forest Service ultimately selected the Project route, which travels exclusively over Truman Trail, for a variety of reasons, including because Alternative C would require more helicopter use and take longer to complete.  *See* AR 05564, 5571–72.

As discussed *supra* Section II(D)(1) (ACS objectives), Plaintiffs appear to conflate effects analysis from the UTV Project with the Project currently at issue.  The EA repeatedly considered possible the cumulative effects of using the Duck Bay route with the current Project but found the impacts do not lead to "any additional measurable cumulative effects" because they would not overlap in time or space.  AR 05570 (considering cumulative effects of the Project with the Duck Bay route on research) AR 05576 (same for visual resources); AR 05586

---

[2] In reply, Plaintiffs appear to waive an argument raised in their motion for summary judgment that the Forest Service failed to consider the impact of seasonal rain on the Duck Bay route.  *See* Dkts. 18 at 36 and 32 at 19.  Nonetheless, this argument appears to have been based on the misunderstanding that the Duck Bay Route would be used for this Project, and it is not convincing.

1  (same for recreation); AR 05599 (same for aquatic species).  Plaintiffs argue the Forest Service

2  should have considered additional cumulative impacts from long-term management at Spirit

3  Lake, but there is nothing tangible left for the Forest Service to consider.  It considered how use

4  of the Duck Bay route could cumulatively affect the area, and there are no other pending

5  management projects.  Plaintiffs argue that long-term management projects are inevitable.  Dkt.

6  32 at 20.   Those effects should be considered in the future when there is a tangible plan to

7  assess.

8         The Forest Service took a sufficiently hard look at the probable consequences described

9  above and made a well-informed decision on each issue.

10      **2.  THE FINDING OF NO SIGNIFICANT IMPACT (FONSI)**

11         An agency must prepare an EIS if the EA raises "substantial questions" about

12  whether the proposed agency action will "'significantly affect the quality of the human

13  environment.'"  *Bark v. U.S. Forest Service*, 958 F.3d 865, 868 (9th Cir. 2020) (quoting 42

14  U.S.C. § 4332(2)(C)).  "Whether an action may 'significantly affect' the environment requires

15  consideration of 'context' and 'intensity.'"  *Ctr. for Bio. Diversity v. Nat'l Highway Traffic*

16  *Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008) (quoting 40 C.F.R. § 1508.27).  "Context refers to

17  the setting in which the proposed action takes place."  *Ocean Advocates v. United States Army*

18  *Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005) (citing 40 C.F.R. § 1508.27(a)).  "Intensity

19  means 'the severity of the impact.'"  *Id.* (citing 40 C.F.R. § 1508.27(b)).

20         Federal regulations list ten factors that should be considered in evaluating intensity,

21  and Plaintiffs argue that the Forest Service failed to properly consider nine of those factors.[3]

22

23  _____

[3] The only intensity factor analysis Plaintiffs do not challenge is 40 C.F.R. § 1508.27(b)(9), the degree to which the
24  action may adversely affect an endangered or threatened species.

### a. Impacts That May Be Both Beneficial and Adverse

In evaluating intensity, the Forest Service should consider "[i]mpacts that may be both beneficial and adverse.  A significant factor may exist even if the Federal agency believes that on balance the effect will be beneficial."  40 C.F.R. 1508.27(b)(1).

According to Plaintiffs, adverse effects will include, but are not limited to, "increased sedimentation from road construction and use, disruption and termination of long-term scientific research, destruction of riparian and other vegetation and unique plant and animal assemblages, introduction and spread of invasive nonnative species, disruption of recreational access, lost education outreach opportunities, lost training opportunities for undergraduates and graduate students, changes to the view from Johnston Ridge Observatory and Windy Ridge Overlook, alteration of aquatic process and function, and alteration of the topography of Spirit Lake bottom."  Dkt. 18 at 39.  The record indicates that all of these concerns are valid, and demonstrates that the Forest Service considered all of them.  After considering them, the Forest Service concluded that effects would be "minimal and localized."  AR 06329; *see* AR 05569–70 (research); AR 05575–78 (visual resources); AR 05585–86 (recreation); AR 05590 – 91 (soils); AR 05594–95 (hydrology); AR 05598–60 (aquatic species); AR 05603–05 (terrestrial species); AR 05608–09 (botanical species); AR 05610–11 (heritage resources).

Instead of discussing which potential effects Plaintiffs believe the Forest Service failed to consider, Plaintiffs mischaracterize the Forest Service's argument as "stat[ing] without legal authority that an EIS is not required for a project with beneficial effects."  Dkt. 32 at 21.  The Forest Service does not make this argument.  The Forest Service states, "[t]he FONSI explained that even if the beneficial effects of presenting a breach of the debris dam outweighed any adverse impacts, those impacts do not rise to the level of significance" because "'any

1   adverse effects from the [Project] will be minimal and localized.'"  Dkt. 30 at 32 (citing AR

2   06329).  This sentence merely explains the Forest Service's conclusion that adverse impacts do

3   not rise to the level of significance without weighing them against potential beneficial impacts.

4   This was the proper analysis.  Neither the Forest Service's analysis, nor its conclusion was

5   arbitrary, capricious, or contrary to law.

6                    **b.  Effect on Public Safety**

7            The second intensity factor the Forest Service considered is "[t]he degree to which

8   the proposed action affects public health or safety."  Plaintiffs argue that an EIS should have

9   been prepared because the need for the Project is directly tied to public health and safety.  Dkt.

10  18 at 40 (citing 40 C.F.R. § (b)(2)).

11           Plaintiffs' argument misconstrues the purpose of an EIS, which is "to provide full

12  and fair discussion of significant environmental impacts and [] inform decisionmakers and the

13  public of reasonable alternatives which would avoid or minimize adverse impacts…."  40 C.F.R.

14  § 1502.1.  For that reason, an EIS is required when there are potential impacts that the agency,

15  decisionmakers, and the public need to consider more carefully.  *See id.*  The significance

16  analysis is the threshold to make this determination.[4]  *See* 40 C.F.R. § 1508.13.  Neither federal

17  regulations, nor case law support Plaintiffs' claim that an EIS must be prepared for all projects

18  intended to benefit public health and safety.  The record supports the Forest Service's conclusion

19  that the Project will not have a significant impact on public health or safety.

20                    **c.  Unique Characteristics of the Geographic Area**

21           The third intensity factor asks the Forest Service to consider "[u]nique

22  _____

23  [4] It appears to be an open question in this Circuit whether NEPA requires an agency prepare an EIS when an action
    has a significant beneficial, as opposed to adverse, impact on the human environment.  *Humane Soc. of United
    States v. Locke*, 626 F.3d 1040, 1056 (9th Cir. 2010).  That, however, is not the issue here because the Forest Service
24  determined that the effects would not be significant.

characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas." 40 C.F.R. § 1508.27(b)(3). Significance of historic and cultural resources are discussed in factor eight.

The Project area, which is within a designated Class 1 Research Area and National Monument, is unquestionably unique. That the area is unique, however, does not mean the impact on it will necessarily be "significant." *See Conservation Cong. v. U.S. Forest Serv.*, 235 F. Supp. 3d 1189, 1202 (E.D. Cal. 2017) (citing *Klamath Siskiyou Wildlands Ctr. v. Grantham*, 424 F. App'x 635, 638 (9th Cir. 2011)).

As with the intensity factors discussed above, Plaintiffs emphasize certain potential effects from the Project, like impact on wetlands and scientific research, Dkts. 18 at 40 – 41 and 32 at 22, but, again, the Forest Service fully considered these effects, *see e.g.*, AR 06330–31. It anticipates impact to approximately 0.63 acres of wetlands, to current research near the project area and temporary access road, and to certain habitats, although none designated as "critical" under the Endangered Species Act. AR 06330–31. Upon consideration of these effects, the Forest Service concluded that "due to the limited area impacted by project activities and the short-term nature of the effects (less than 10 years)" the effects do not rise to the level of a significant impact. *See* AR 06330. This is a reasonable conclusion based on the record.

### d.  Highly Controversial or Uncertain Effects

The next two factors agencies should consider are "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial," 40 C.F.R. § 1508.27(b)(4), and "[t]he degree to which the possible effects are highly uncertain or involve unique or unknown risks," *id.* § 1508.27(b)(5). "Controversial" means "a substantial dispute

1    about the size, nature, or effects of the major Federal action rather than the existence of

2    opposition to a use."  *Barnes v. FAA*, 865 F.3d 1266, 1275 (9th Cir. 2017) (internal quotation

3    omitted).

4            Some level of uncertainty will always exist.  An EIS, however, is not required

5    "anytime there is some uncertainty, but only if the effects of the project are 'highly' uncertain."

6    *In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751

7    F.3d 1054, 1070 (9th Cir. 2014) (internal quotation omitted).  Plaintiffs argue that "there is a

8    great deal about the Pumice Plain and Spirit Lake that is unknown."  Dkt. 32 at 23.  As

9    examples, they argue that effects on ongoing scientific research and of further spread of the New

10   Zealand Mud Snail on the ecology of Spirit Lake and the Pumice Plain remain unknown.  *Id.*

11   Plaintiffs also emphasize that an EIS should be prepared when further data collection may

12   resolve lingering uncertainty or prevent speculation on potential effects.  Dkt. 18 at 42 (quoting

13   *W. Watersheds Project v. Bureau of Land Mgmt.*, 552 F. Supp. 2d 1113, 1135–36 (D. Nev.

14   2008).  This point demonstrates why these facts do not require an EIS in this case: nothing on the

15   record suggests further data collection would resolve lingering uncertainty, nor is there reason to

16   believe the range of possible effects is extreme or particularly unknown.

17           From the facts on the record, the Forest Service reasonably concluded that the

18   nature, size, and potential effects of the project are not highly controversial or uncertain.

19       **e.  Degree of Precedential Value and Relation to Other Actions**

20           The next factor to consider is "[t]he degree to which the action may establish a

21   precedent for future actions with significant effects or represents a decision in principle about a

22   future consideration."  40 C.F.R. § 1508.27(b)(6).  The purpose of this factor "is to avoid the

23   thoughtless setting in motion of a chain of bureaucratic commitment that will become

24

progressively harder to undo the longer it continues." *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1162 – 63 (9th Cir. 1998) (internal quotation omitted).

Plaintiffs argue that once the Forest Service builds the road "it is possible – perhaps likely – that the road will be used in the future for the long-term management that the Project is intended to obtain data to inform." Dkt. 32 at 24.  This slippery slope argument is mere speculation and not supported by the record or by law.  The approved Project plan is for the road to be temporary.  AR 06297.  All non-native material will be removed, the natural ground contours, drainage patterns restored, and the area revegetated after the project is complete.  *Id*. By nature, "EAs are usually highly specific to the project and the locale, thus creating no binding precedent." *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1140 (9th Cir. 2011).  Plaintiffs do not indicate why this Project is different or demonstrate a potential chain of bureaucratic commitments that it may set in motion.  Therefore, the Forest Service reasonably concluded the degree of precedential value was not significant.

### f.   Cumulative Impact

Next, agencies must consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts."  C.F.R. § 1508.27(b)(7).

For the reasons stated *supra* Section II(E)(1)(c), the Forest Service took a hard look at potential cumulative impact from past, present, and reasonably foreseeable future projects, and it reasonably concluded that the cumulative impact would not be significant.

### g.   Loss or Destruction of Significant Scientific, Cultural, or Historical Resources

An agency should consider "[t]he degree to which the action may adversely affect . . . objects listed in or eligible for listing in the National Register of Historic Places or may cause

the loss or destruction of significant scientific, cultural, or historical resources."  40 C.F.R. §

1508.27(b)(8).  Impact on scientific study was discussed *supra* Section II(E)(1)(b).

As for impacting cultural resources, the Forest Service found that the Project "would

have an adverse effect on the National Register listed Cultural Property Lawetlat'la per 36 CFR

800.5(a)(2)(v) through 'introduction of visual, atmospheric, or audible elements that diminish the

integrity of the property's significant historic features.'"  AR 06333.  Lawetlat'la is the tribal

name for an area above the tree line on Mount St. Helens.  AR 04147.  Because of the potential

adverse effect to Lawetlat'la, the Forest Service consulted with the Cowlitz Indian Tribe and

together they entered into a memorandum of understanding to facilitate shared management of

the land.  AR 04147–56.  Ultimately, the Forest Service determined that any impacts to

Lawetlat'la "are not expected to be significant" because the Project area does not physically

overlap with Lawetlat'la, and impacts would only last for the Project's duration.  AR 06333.

The Forest Service engaged with the affected tribe, and its conclusion that the impact would not

be significant was informed and reasonable.

Plaintiffs also argue that the Forest Service "does not address either the Pumice Plain

or Spirt Lake's nature as cultural resources," Dkt. 32 at 25, and emphasize that Mount St. Helens

"serves as a potent historical reminder of the awesome power of nature" that is "no place for a

road."  Dkt. 18 at 47.  The Forest Service may not have considered the Pumice Plain and Spirit

Lake's nature in the terms Plaintiffs would have preferred, but it thoroughly considered

Plaintiffs' concern, which is that the Pumice Plain and Spirit Lake are unique and important for a

variety of reasons, and the Project will negatively affect them.  Plaintiffs clearly wish the Forest

Service had come to a different conclusion, but that is not at issue.  The Forest Service took a

hard look at the effects of the project, and the Court must defer to its judgment.

### h. Threatened Violation of Law

Finally, an agency should consider "[w]hether the action threatens a violation of Federal, state, or local law or requirements imposed for the protection of the environment." 40 C.F.R. § 1508.27(b)(10). Plaintiffs assert that "as discussed *supra*, the Project threatens violations of the Northwest Forest Plan and therefore the Northwest Forest Management Act, federal laws enacted for the protection of the environment." Dkt. 18 at 47. As discussed, the Forest Service thoroughly considered this factor. *See* AR 06334. Discussion about impact on retention visual quality objective of the Mount St. Helens National Monument Comprehensive Management Plan (the RVQO), on Aquatic Conservation Objectives, and about the significance of impacts in general were all used to assess whether the Project threatened to violate environmental laws or regulations. The Forest Service made its decision based on a hard look at the evidence, and its conclusion was reasonable.

For these reasons and the reasons discussed throughout the Order, the Forest Service did not act arbitrarily, capriciously, or contrary to law. There are no material issues of fact remaining that require resolution of the Court. Therefore, Plaintiffs' Motion for Summary Judgment should be denied, and Defendant's Cross-Motion for Summary Judgment requesting dismissal of Plaintiffs' claims should be granted.

## I.   <u>ORDER</u>

Therefore, it is hereby **ORDERED** that:

- Defendant's Motion to Strike is **GRANTED, in part**;

- Plaintiffs' Motion for Summary Judgment (Dkt. 18) is **DENIED**;

- Defendant's Cross-Motion for Summary Judgment Dismissal (Dkt. 30) is **GRANTED**;

- This case is **CLOSED**.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing pro se at said party's last known address.

Dated this 22nd day of December, 2021.

ROBERT J. BRYAN
United States District Judge